LORI ROWE, Plaintiff-Appellant, v. STATE BANK OF LOMBARD, as Trustee, *et al.*, Defendants-Appellees.—LINDA JEAN SERPICO *et al.*, Minors by their Father, Andrew Serpico, *et al.*, Plaintiffs-Appellants, v. TODD FENNESSEY *et al.*, Defendants-Appellees.

Second District   Nos. 86—0159, 86—0160 cons.

Opinion filed March 24, 1987.

Walter P. Maksym, Jr., of Oak Brook, for appellant Andrew Serpico.

Thomas E. Callum, of Callum, Anderson & Deitsch, of Wheaton, for appellant Lori Rowe.

Lloyd L. Speer and Scott D. Bromann, both of Speer & Associates, of Wheaton, for appellee Leland Stahelin.

Thomas R. Weiler and John Edwin Norton, both of O'Reilly, Cunningham, Duncan & Huck, of Wheaton, for appellees Todd Fennessey and Paramount Group.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, Lori Rowe, sought damages for personal injuries in her negligence action against defendants. Plaintiffs, Linda Serpico and Andrea Serpico, minors, by their father, Andrew Serpico, and Andrew Serpico individually and as administrator of the estate of Bonnie Lee Ann Serpico, commenced an action in the trial court for negligence under the Wrongful Death Act (Ill. Rev. Stat. 1979, ch. 70, par. 1 *et seq.*) and Probate Act (Ill. Rev. Stat. 1979, ch. 110½, par. 1—1 *et seq.*) for damages resulting from the death of Bonnie Lee Ann Serpico, Andrew Serpico's late wife and the minors' mother. Their action, which was based on substantially the same theories of liability as were advanced by Lori Rowe, was consolidated in the trial court. The trial court granted summary judgment in favor of certain defendants, and this appeal has been brought to obtain reversal of these judgments. We affirm.

On April 24, 1978, at approximately 4 a.m., Bonnie Lee Ann Serpico (Bonnie) and Lori Rowe (Lori) were working the midnight to 8 a.m. shift at the offices of J-Mar Enterprises (J-Mar) in building number 1 of the Glen Hill Office Park (GHOP), located at 799 Roosevelt Road, Glen Ellyn, Illinois. These offices were leased from the Paramount Group (Paramount). That night, James Free, Jr. (Free), gained entrance to an office through an allegedly locked door to the room in which Bonnie and Lori were working. He was wearing a mask and holding a gun.

Bonnie attempted to run for help, but was shot in the back and died. Free then entered another room where he bound Lori, shot her, left her for dead, and fled. Lori crawled to a telephone and called the Glen Ellyn police. When the first police officer arrived on the scene, he kicked and broke down the door through which Free gained entry in order to obtain entry to the office and render assistance to Lori. Bonnie's minor daughters, husband, and estate filed an action for wrongful death. Their amended complaint consisted of nine counts. Lori's action was only for her personal injuries.

Counts I, II, and III are not involved in this appeal.

Count IV sought damages against Paramount and Todd Fennessey (Fennessey), individually and as agent for the owners, operators, and managers of GHOP who controlled building number 1 and were responsible for its security, maintenance, condition, and repair. That count alleged that the premises were not reasonably safe because, *inter alia*, the defendants voluntarily undertook and provided certain security measures for the benefit of its lessees and its lessees' employees yet failed to exercise reasonable care in the performance of

said undertakings. They were guilty of: (a) negligently failing to provide adequate locks on the doors to the office; (b) negligently failing to change the locks on the doors to the office in the above-described premises when new tenants occupied said office; (c) changing and re-keying the locks on the doors to the office when they knew or should have known that these locks could be opened by persons who had access to, or had otherwise obtained, master keys to the locks; (d) negligently failing to secure keys from old tenants of the office; (e) negligently failing to maintain and control a list of all persons having possession of master keys; (f) negligently maintaining operational procedures which allowed unauthorized persons or other members of the general public to obtain or make copies of master keys; (g) negligently failing to control the number and allocation of master keys; (h) negligently failing to modify the lock and master key system maintained upon the premises when they knew or should have known that said system was unsafe; (i) negligently failing to install materials and other lock parts which would render unaccounted master keys inoperative; (j) negligently failing to provide sufficient and/or adequate security personnel for the above-described premises; (k) negligently failing to provide an alarm system or adequate alarm system for the premises; and (l) negligently failing to provide adequate protection for the decedent when they knew, or in the exercise of ordinary care should have known, that the decedent and other females were present upon the premises after normal working hours. Plaintiffs further alleged that as a direct and proximate result of one or more of the aforesaid negligent acts or omissions, defendant James P. Free, Jr., gained admittance to the office in the premises, shot and killed the decedent on April 24, 1978.

Count V was against the same parties. In this count plaintiffs further alleged, *inter alia*, that on the aforesaid date and place and prior thereto one or more or all of the following circumstances were known to the defendants: (a) that a person or persons had entered and gained access to locations supposedly secured by locked doors in buildings upon its premises; (b) that one person who had gained unauthorized entry to a GHOP building had attempted to entice women; (c) that recommendations by defendants' employees were made to change keys and locks to the existing doors; and (d) that prior crimes had been committed upon the defendants' premises.

Counts VII and VIII were actions brought against Fennessey and Paramount for damages including pain, suffering, and mental anguish and funeral expenses under section 27—6 of the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 27—6). Counts VI and IX were

brought against J-Mar, Bonnie's employer. Since summary judgment was denied as to them, these counts are not involved in this appeal.

An action was also brought against Leland Stahelin, the developer and prior owner of GHOP, and others, on substantially the same grounds as originally pleaded against Fennessey and Paramount. Stahelin had sold GHOP to Paramount in 1976.

On October 15, 1981, Fennessey and Paramount filed their motion for summary judgment. Attached was a comment made by Lori in her deposition that she personally had not been aware of any prior break-ins, threats by use of a gun, or attempted rapes at GHOP and Fennessey's affidavit which maintained that up to and including April 24, 1978, no tenant or employee of GHOP had been forcibly assaulted by an intruder with a gun, nor had any person been raped, sexually assaulted, or shot.

Plaintiffs responded to this motion on December 11, 1981, with numerous affidavits and depositions which stated, *inter alia*, that, on April 24, 1978, Lori observed Free as he appeared inside her office's locked door and that after the shooting, the police had to break down the office door to reach her; that Robert Davis, chief of engineering and maintenance at the GHOP, tried to convince Stahelin to rekey the locks so that missing master keys would be ineffective; that Stahelin refused to do so because the cost was too high; that Davis saw Free with sets of master keys; and, that after the sale, Fennessey refused to change the locks. Fennessey's deposition stated that he was called at home and came to the complex as a result of two telephone calls made by a woman who worked at GHOP. She had told him that a man appeared inside the locked doors asking about carpets that needed to be cleaned. He went to the premises to see if any of his other tenants had contracted for such work. When he arrived, the individual had left. He, therefore, did not notify the police or alert the women working at J-Mar.

On January 1, 1982, the trial court denied Fennessey's, Paramount's, and J-Mar's motion for summary judgment. On January 8, 1982, the court granted Stahelin's motion for summary judgment on the ground that he did not own the premises at the time of Bonnie's death.

On July 6, 1984, per administrative order, this cause was reassigned to Judge William E. Black. He set the case for jury trial. On August 6, 1984, Fennessey and Paramount filed a motion for rehearing on the motion for summary judgment that had been previously denied by Judge Bowman. Since the motion to reconsider cited no new authorities or facts or changed circumstances, plaintiffs filed a motion

to strike which the trial court denied.

Plaintiffs then filed several additional affidavits. The affidavits of several Glen Ellyn police officers reflected their investigations of various thefts and burglaries at GHOP. One employee at GHOP stated that on April 23, 1978, she received a suspicious telephone call requesting her presence in the lunch room. Another co-worker filed an affidavit stating that on April 23, 1976, she saw Free in her building at GHOP.

On October 5, 1985, after oral arguments, Judge Black granted Fennessey's and Paramount's motion for summary judgment but denied that of the employer J-Mar. On December 7, 1984, the court denied the plaintiffs' and J-Mar's motions to reconsider.

On January 24, 1986, the court found that there existed no just reason to delay appeal or enforcement of the summary judgment orders with respect to all summary judgment orders. On February 21, 1986, plaintiffs timely filed their notice of appeal seeking reversal of the summary judgment orders with remand for a jury trial.

■ Plaintiffs first contend that Judge Black abused his discretion when he considered a motion which had been previously denied by Judge Bowman. Citing *Balciunas v. Duff* (1983), 94 Ill. 2d 176, plaintiffs argue that the Illinois Supreme Court held that it is improper for a subsequent judge of the same court to reverse a prior ruling if he were not presented with any change of circumstances or additional facts which would warrant such action. We disagree.

In *Balciunas*, the supreme court was confronted with a plaintiff complaining that a trial judge reversed orders entered by another judge of coordinate authority in the context of discovery orders. (94 Ill. 2d 176, 183.) The court voiced its awareness of widespread abuses in the discovery phase of litigation and concluded that it was "particularly appropriate for a judge before whom a motion for reconsideration is pending to exercise considerable restraint in reversing or modifying previous rulings. This is especially true if there is evidence of 'judge shopping' or it is apparent that a party is seeking, for delay or abusive purposes, a reconsideration of prior rulings." (94 Ill. 2d 176, 187-88.) The court contrasted this with a previous holding where "this court has indicated that prior interlocutory rulings should be modified or vacated by a successor judge only after careful consideration." 94 Ill. 2d 176, 187, citing *Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 121; *Leopold v. Levin* (1970), 45 Ill. 2d 434, 446.

The instant case does not involve one judge reversing another's discovery orders. It falls within the ambit of *Towns* in that a successor judge, after careful consideration, reviewed and altered a prior interlocutory ruling. Further, there is no "judge shopping" involved here,

nor is it contended otherwise. We find no abuse of discretion in Judge Black's actions.

■■ Plaintiffs next challenge the trial court's grant of defendants' summary judgment motion. The purpose of a summary judgment proceeding is not to try an issue of fact, but rather to determine whether there is an issue of fact to be tried, and a reviewing court will reverse an order granting summary judgment if it is determined that a material fact exists. Because different inferences may be drawn from undisputed facts, summary judgment should be allowed only where reasonable men cannot draw different inferences from undisputed facts. *Milwaukee Cheese Co. v. Cornerstone Inn, Inc.* (1986), 142 Ill. App. 3d 840, 842; *Schnabel v. County of Du Page* (1981), 101 Ill. App. 3d 553, 560-61.

Plaintiffs argue that the defendants had a duty to protect Bonnie and Lori from third parties. They claim that Bonnie and Lori had a special relationship with the defendants in that they were business invitees and, therefore, the beneficiaries of a higher standard of care owed by the defendant landlords. They also contend that even if Bonnie and Lori are not classified as being in a special relationship with the defendants, under the circumstances present in the instant case, a duty was still owed by the defendants since they knew or should have known that the criminal attack by Free was eminently foreseeable.

We disagree.

■■ ■ It is well established that there can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff. (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 208; *Keller v. Mols* (1984), 129 Ill. App. 3d 208, 210.) Whether there is a legal duty is a question of law to be decided by the courts. (*Ferentchak v. Village of Frankfort* (1985), 105 Ill. 2d 474, 480; *Champs v. Chicago Housing Authority* (1986), 141 Ill. App. 3d 881, 883.) In Illinois, a landlord does not owe its tenants a high degree of care to protect them from assaults by third persons. (*Phillips v. Chicago Housing Authority* (1980), 91 Ill. App. 3d 544, 546.) While there is such a duty where a special relationship exists (common carrier-passenger, business invitor-invitee, and innkeeper-guest), the landlord-tenant relationship has not been considered to be a special relationship which would create the existence of such a duty. *Martin v. Usher* (1977), 55 Ill. App. 3d 409, 410; *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97.

■■ Three exceptions, however, exist to this general rule. A landlord may be liable to a tenant if (1) the injury, although due to criminal activity, occurs because of a condition of the premises (*Stribling v. Chi-*

*cago Housing Authority* (1975), 34 Ill. App. 3d 551, *appeal denied* (1976), 62 Ill. 2d 592); (2) the landlord attempts to safeguard the premises but does so negligently (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204); or (3) the landlord, by his acts, creates a hazard which did not previously exist (*Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313).

In *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, the apartments on either side of plaintiffs' apartment were vacant and unsecured. (34 Ill. App. 3d 551, 553.) The plaintiffs were burglarized three times within a 47-day period. On each occasion, the burglars entered plaintiffs' apartment by demolishing a common wall between the plaintiffs' apartment and one of the vacant apartments. The court found that the landlord had no duty to protect against the first burglary but, "after defendants had notice of the original burglary and the means used in effecting the burglary, the fact that another burglary could happen in the same fashion became eminently foreseeable." (34 Ill. App. 3d 551, 556.) Therefore, the defendants owed plaintiffs a duty to guard only against the second and third burglaries.

In *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, plaintiff brought a wrongful-death action against the Chicago Housing Authority. Plaintiff's decedent was assaulted in defendant's lobby in the presence of two security guards who negligently allowed the altercation to take place. The trial court granted summary judgment, and the appellate court reversed. (*Pippin v. Chicago Housing Authority* (1978), 58 Ill. App. 3d 1029, *aff'd* (1979), 78 Ill. 2d 204.) The supreme court affirmed, finding that at the time of the incident, a contract for security existed between the Chicago Housing Authority and the security agency. (78 Ill. 2d 204, 207.) The court reasoned that "[a]lthough the Authority had no independent duty to protect against criminal acts on its premises, it voluntarily entered into a contract with Interstate, an independent contractor, by which the latter agreed to provide guard services on Authority premises." (78 Ill. 2d 204, 209.) Therefore, the defendant could be held liable only for the negligent hiring of the security agency.

In *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, the Chicago Housing Authority undertook to provide part-time guard service from 9 a.m. to 1 a.m. The plaintiff was severely beaten at about 1:15 a.m. by several unknown men as he was waiting for an elevator in defendant's lobby. The trial court granted the defendant's motion to dismiss, but the appellate court reversed. (82 Ill. 2d 313, 314.) The supreme court affirmed, stating that in providing a service voluntarily assumed, the landlord was obligated to use reasonable care not to cre-

ate increased dangers to persons lawfully on its property. 82 Ill. 2d 313.

Initially, plaintiffs contend that defendants should be liable pursuant to the holding in *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, *appeal denied* (1976), 62 Ill. 2d 592. We disagree. The *Stribling* court held that the defendant landlord had no duty to guard against the original burglary. It was only after the defendant had notice of the original burglary and the means used in effecting the burglary that it owed plaintiffs a duty to guard against any subsequent burglaries. In the instant case, a close examination of the record reveals that no prior violent criminal activity existed at GHOP.

■ Plaintiffs next argue that the defendants should be liable pursuant to *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204. They charge that defendants affirmatively acted in attempting to safeguard the premises, but they did so negligently.

We do not believe that an application of *Pippin* is appropriate given the circumstances in the instant case. *Pippin* and its progeny apply to circumstances where a landlord voluntarily undertakes to exercise reasonable care in protecting persons lawfully on the premises from foreseeable criminal attacks or other foreseeable dangers. In *Pippin*, the Chicago Housing Authority had contracted for security "for the purpose of guarding its properties *** and the protection of persons thereon." (78 Ill. 2d 204, 207.) While *Pippin* is not to be interpreted narrowly on its facts (see *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 317), the Chicago Housing Authority's duty was limited to the use of reasonable care in engaging the corporation to provide guard services. It could be liable, at most, for the negligent hiring of the corporation.

We find the case of *Carrigan v. New World Enterprises, Ltd.* (1983), 112 Ill. App. 3d 970, to be instructive. In *Carrigan*, the court reviewed the case law relating to a landlord's duty to protect tenants from criminal acts by third parties and concluded that the "common thread running throughout these cases is that the reviewing court recognized that the landlords undertook to provide measures which would provide added protection from crime to their tenants. The acts of the landlords rose from contractual obligations and did not constitute a voluntary undertaking to protect tenants from harm from third persons or to provide security to certain areas." (112 Ill. App. 3d 970, 975.) The *Carrigan* court concluded that the duty imposed on landlords is a very limited one, and it reversed a jury award in favor of plaintiff. The landlord had installed a burglar alarm and contracted to keep same operable. He was on notice that the alarm was broken but

did not repair it. The plaintiff was assaulted and raped by an intruder who gained access through a first-floor window in which the inoperable burglar alarm was installed. The court concluded that the landlord did not voluntarily or contractually promise the plaintiff that she would be protected from third parties, only that he would keep the burglary alarm operable. Therefore, the liability of the landlord would be limited to cost of paying an alternative repairman. 112 Ill. App. 3d 970, 978; see also *Beck v. Rossi Brothers* (1984), 125 Ill. App. 3d 874.

In the instant case, an examination of the parties' lease reflects that there was a provision entitling the lessor to enter and make "repairs or alterations as it shall deem necessary for the safety, preservation or improvement of said premises or said building." There were also provisions which prohibited the lessee from making alterations or additions to the premises (including additional locks) without first obtaining lessor's written consent. There was, however, no contractual obligation extending from defendants to plaintiffs' employer which provided for security services or protection. The deposition testimony of GHOP's engineer reflects that all door locks were apparently functioning properly and the management rekeyed them after tenants vacated the offices.

Furthermore, we do not believe that defendants possessed a duty to protect the plaintiffs from their injuries. The injuries complained of by the plaintiffs must have been reasonably foreseeable in order to impose a duty. (*Morgan v. Dalton Management Co.* (1983), 117 Ill. App. 3d 815, 818.) There must have been more than a simple possibility of the injury's occurrence, and the incident must have been foreseeable as likely to happen by a reasonably prudent person. (*Cunis v. Brennan* (1974), 56 Ill. 2d 372.) In the instant case, we do not think it reasonably foreseeable that plaintiffs would be severely injured or killed simply because defendants, at most, were not in possession of one or more master keys. Reasonable foreseeability must be judged by what was apparent to the defendants at the time of the now complained-of conduct and not by what may appear through the exercise of hindsight. 56 Ill. 2d 372; *Morgan v. Dalton Management Co.* (1983), 117 Ill. App. 3d 815, 819.

Therefore, the judgment of the trial court is accordingly affirmed.

Affirmed.

LINDBERG, P.J., and NASH, J., concur.