(No. 65167.—

LORI ROWE *et al.*, Appellants, v. STATE BANK OF LOMBARD, as Trustee, *et al.*, Appellees.

*Opinion filed September 22, 1988.—Rehearing denied December 5, 1988.*

206

STAMOS, J., took no part.

Walter P. Maksym & Associates, of Oak Brook (Walter P. Maksym, of counsel), for appellants.

O'Reilly, Cunningham, Norton & Mancini, of Wheaton (Thomas R. Weiler and John E. Norton, of counsel), for appellees Todd Fennessey *et al.*

Speer & Associates, of Wheaton (Lloyd L. Speer, of counsel), for appellee Leland Stahelin.

Jon A. Duncan, of Mass, Miller & Josephson, Ltd., of Chicago, for *amicus curiae* Joseph A. Duncavage.

Howe & Hutton, Ltd., of Chicago (Jonathan T. Howe, Terrence Hutton and John M. Peterson, of counsel), for *amicus curiae* Institute of Real Estate Management.

JUSTICE WARD delivered the opinion of the court:

Plaintiff Lori Rowe sustained personal injuries when she and Bonnie Serpico were attacked, and then shot, while they were working at a large office park located in Glen Ellyn. Serpico was killed. Rowe and Serpico's husband, Andrew, and minor children, Linda and Andrea, brought separate actions for damages in the circuit court of Du Page County against, among others, the Paramount Group, Inc., companies that collectively owned and managed the office park; Todd Fennessey, Paramount's managing agent; and Leland Stahelin, the developer and a prior owner of the office park. The circuit court consolidated the actions, granted summary judgment in favor of the defendants, and pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)), authorized an interlocutory appeal. The appellate court affirmed (153 Ill. App. 3d 788), and this court granted

the plaintiffs' petition for leave to appeal under Rule 315(a) (107 Ill. 2d R. 315(a)).

In the early morning hours of April 24, 1978, Rowe and Serpico, employees of J-Mar Enterprises, were working at their office on the first floor of building No. 1 of the Glen Hill Office Park, which contains eight separate commercial office buildings. J-Mar leased the office space from Paramount, which held beneficial interest to the property under a land trust. The State Bank of Lombard held title to the property and served as trustee.

At approximately 4 a.m., an intruder entered the office in which they were working through a door which opened directly into the office space, and at gun point, forced Rowe and Serpico, who were alone at the time, into the lunchroom of the building. He tied Rowe's hands behind her back and took Serpico into another room. As Rowe struggled to free herself, the assailant returned and knocked her to the ground. Rowe then heard Serpico running from the other room and saw the assailant turn and run after her. Several seconds later Rowe heard a gunshot. The assailant returned and shot Rowe before running from the building. After he fled, Rowe called the police, who were forced to break the office door down to reach her. Serpico died in the assault and Rowe sustained serious personal injuries. The police investigation determined that the assailant was James Free, who had previously worked at the office park for Stahelin as a construction laborer. He was arrested, convicted and sentenced to death. See *People v. Free* (1983), 94 Ill. 2d 378.

Plaintiffs Linda and Andrea Serpico, Bonnie Serpico's minor daughters, by their father, Andrew Serpico, and Andrew Serpico, individually and as administrator of the decedent's estate, brought an action in the circuit court of Du Page County for the wrongful death and personal injury of the plaintiffs' decedent against Free, J-Mar, the

State Bank of Lombard, Paramount, Stahelin, and Fennessey, individually and as Paramount's agent. The complaint alleged that Paramount, Fennessey and Stahelin had a duty, or had assumed a duty, to protect the decedent while she was on the premises of the office park from "criminal or tortious attacks by intruders or other third persons." It charged that they breached this duty by, *inter alia*, failing to properly maintain the locks on the doors to J-Mar's office; failing to control the distribution of master keys and grandmaster keys; failing to warn the decedent that master and grandmaster keys were outstanding and unaccounted for; failing to warn of the numerous criminal incidents that had been reported at the office park; and otherwise failing to provide adequate security on the premises. It further alleged that as a proximate result of the defendants' negligence in failing to provide the necessary security measures or adequate warnings, Free was allowed to enter J-Mar's offices where he shot and killed the decedent.

Rowe brought a separate action in the circuit court of Du Page County against the defendants, which was consolidated with the Serpicos' action, and set out substantially the same allegations as those set out in their complaint.

Defendants Fennessey and Paramount filed a motion for summary judgment, and in support, filed excerpts from a deposition of Lori Rowe and an affidavit of Fennessey. Both stated that they could not recall a break-in or forcible assault occurring at the office park prior to April 24, 1978. Also attached to their motion was a copy of J-Mar's lease with Paramount, which provided:

> "The Lessee shall use and occupy said premises for business office use and for no other purpose; and the Lessee shall, at his own expense, keep said premises in good repair and tenantable condition during said term, replacing at his own expense, any and all broken glass in or about

said premises with glass of the same size and quality, and replacing signs thereon.

\* \* \*

Lessor shall not be liable and Lessee waives all claims for injury or damage to person or property sustained by Lessee, its employees and agents, resulting directly or indirectly from any act or negligence of any tenant or occupant of the building or of any other person. All personal property belonging to Lessee, its agents and employees, that is on the premises shall be there at the risk of Lessee and Lessor shall not be liable for any damage thereto or the theft or misappropriation thereof."

Stahelin filed a motion for summary judgment also, and in an attached affidavit, stated that he sold the office park to Paramount in August of 1976, and turned over the master keys in his possession to the new owners at that time.

The plaintiffs filed the deposition and affidavit of Robert Davis, a maintenance engineer at the office park who was employed by both Paramount and Fennessey. Deposed, he stated that during the time that Stahelin owned the office park several individuals were given master keys which would open the doors to each building at the office park, and grandmaster keys which would open the door locks in all of the buildings. He could not recall if Stahelin maintained records of who was given these keys or whether they were collected when the office park was sold. Davis also stated that when a tenant vacated an office at the expiration of the lease, the door locks were simply "re-keyed" for the new tenant. This would render the prior tenant's keys inoperative, but not the master or grandmaster keys.

In an affidavit, Davis stated that in early 1976, he told Stahelin that he believed a number of master keys were unaccounted for and that Stahelin authorized him to purchase the materials necessary "to change the lock system so that the old master keys would not work."

When the parts arrived, however, Stahelin told him not to install them because of the cost, which, according to Davis, was $2,500. Davis testified that he made the same suggestion to Fennessey after Stahelin sold the office park to Paramount, but that Fennessey's superior, Martin Panek, rejected the idea also due to the expense. Davis further testified that during the time that Free was employed by Stahelin, he "frequently saw James Free with sets of master keys in his possession."

The plaintiffs also filed excerpts from a deposition of Fennessey in which he stated that on the afternoon of April 23, 1978, he received a call from a woman who worked in building No. 4 at the office park. She told Fennessey that a man (whom she later identified as James Free following his arrest) was in the building "asking about carpets that needed to be cleaned." When Fennessey arrived the man had left; Fennessey checked the doors to the building, talked briefly to the woman and left.

The trial court denied Fennessey and Paramount's motion for summary judgment but granted Stahelin's motion. The court held that Stahelin owed no duty to protect Rowe or Serpico from the criminal assault because he did not own or manage the office park at the time of the assault by Free. The State Bank of Lombard was dismissed on the ground that, as trustee, it held only legal title to the property and, therefore, was not not responsible for managing the property. Before the cause was called for trial, it was reassigned to a different judge pursuant to an administrative order establishing civil and criminal divisions within the circuit. One month later, Fennessey and Paramount filed a petition for reconsideration before the new judge of the original judge's denial of their motion for summary judgment.

In response, the plaintiffs submitted the affidavit of Mary Ferrier, who stated that on April 23, 1978, she

saw James Free in building No. 4 at the office park while she was working. Shortly thereafter, she received a telephone call from a man who stated that "two girls left some change in the lunch room" and that she should come down to get it. Ferrier stated that Mally Heaton, with whom she was working with at the time, called Fennessey, informed him of the call and asked him if the man was authorized to be in the building. Heaton testified in a separate affidavit that when she arrived for work at approximately 8 a.m. on April 23, 1978, the door she entered to building No. 4 was locked and, after being opened, automatically locked behind her. At approximately 9 a.m., she saw James Free enter the same door and "put[] keys in his pocket."

The plaintiff also submitted evidence regarding prior incidents of criminal activity occurring on the premises of the office park. In an affidavit, James Mullany, Glen Ellyn's police chief, listed 17 incidents of criminal activity the police had investigated at the office park in the two years preceding the assault on Rowe and Serpico. He attached the related police reports which showed that eight of the incidents involved acts of theft, five occurring in the parking lot area and three in tenants' offices; eight were burglaries of tenants' offices; and none involved a violent crime.

Robert Velon, a Glen Ellyn police detective, testified in an affidavit that he investigated three burglaries at the office park during 1977 and 1978; that two of the incidents showed no signs of forced entry; and that he advised Fennessey on several occasions that "the locks on the buildings in the complex should be changed in view of the burglaries and thefts reported." John Kleinifen, a Glen Ellyn police officer, stated in an affidavit that in April of 1977, he investigated two reported burglaries at the office park which involved a total theft of $25 worth of postage by someone's operating the company's post-

age machine on two successive nights. Kleinifen stated too that he checked the office doors and found no signs of forced entry. William Bruno, also a Glen Ellyn police officer, stated that he investigated a burglary at the office park on June 9, 1977, involving the alleged theft of $20 from one of the offices located in building No. 3. Bruno stated that he also could not determine how entry was made into the office.

The new trial court granted Paramount and Fennessey's petition for reconsideration of the denial of their motion for summary judgment, stating that they were under no duty as a matter of law to protect Rowe and Serpico from the criminal actions of Free. Pursuant to our Rule 304 (107 Ill. 2d R. 304), the court made a finding that there existed no just reason to delay appeal of its orders granting summary judgment in favor of Paramount, Fennessey and Stahelin, and the appellate court affirmed (153 Ill. App. 3d 788). The plaintiffs' actions against the other defendants still pend in the circuit court and they are not involved in this appeal.

The plaintiffs contend that the trial court erred in granting Paramount and Fennessey's petition for reconsideration of the denial of their motion for summary judgment. They first argue that under *Balciunas v. Duff* (1983), 94 Ill. 2d 176, the trial court was precluded from reversing the prior order because the defendants had not presented additional facts or evidence of changed circumstances to warrant reconsideration.

Unlike the situation here, *Balciunas* involved the propriety of the granting of a petition for reconsideration of a discretionary, pretrial discovery ruling. In contrast, a summary judgment is concerned here, and this court has repeatedly held that the circuit court has the inherent power to modify or vacate an interlocutory order granting summary judgment any time before final judgment. (*Towns v. Yellow Cab Co.* (1978) 73 Ill. 2d 113, 121;

*Leopold v. Levin* (1970), 45 Ill. 2d 434, 446; *Fort Dear-born Lodge No. 214 v. Klein* (1885), 115 Ill. 177, 181.) It is true that this court has disapproved of one judge reviewing interlocutory orders entered by another judge where there is evidence of bad faith or "judge shopping" by the party who obtains an adverse ruling. (See *People ex rel. Phillips Petroleum Co. v. Gitchoff* (1976), 65 Ill. 2d 249; *People ex rel. Kelly, Ketting, Furth, Inc. v. Epstein* (1974), 61 Ill. 2d 229; *People ex rel. East Side Levee & Sanitary District v. Madison County Levee & Sanitary District* (1973), 54 Ill. 2d 442.) Here, however, there is no evidence of bad faith on the part of Paramount and Fennessey in petitioning for reconsideration of the denial of their motion for summary judgment. Nor is there evidence of "judge shopping," as the record shows that the cause was assigned to another judge in the ordinary course of judicial reassignment. We judge that the trial court acted within the bounds of its authority in ruling on Paramount and Fennessey's petition.

The plaintiffs contend that the trial court also erred in holding that Paramount and Fennessey did not have a duty, as a matter of law, to protect Rowe and Serpico from the criminal assault by Free, and therefore were entitled to summary judgment.

Section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005) provides that summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment or decree as a matter of law." (See also *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380.) A motion for summary judgment and its supporting documents must be construed strictly against the movant and liberally in favor of the opponent. (*In re Estate of Whittington* (1985), 107 Ill. 2d 169, 177; *Wil-*

*liams v. Alfred N. Koplin & Co.* (1983), 114 Ill. App. 3d 482, 485; *Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981.) The remedy of summary judgment is a drastic method of disposing of causes and should be granted only when the right of the movant is clear and free from doubt. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240; *In re Estate of Kietrys* (1982), 104 Ill. App. 3d 269, 273.

In an action for negligence, the plaintiff must set out sufficient facts establishing the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 162; *Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374.) In the absence of a showing from which the court could infer the existence of a duty, no recovery by a plaintiff is possible as a matter of law and summary judgment in favor of defendant is proper. Whether under the facts of a case there is a relationship between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court. *Pelham v. Griesheimer* (1980), 92 Ill. 2d 13, 18-19; *Barnes v. Washington* (1973), 56 Ill. 2d 22, 26.

The plaintiffs argue that Paramount, and Fennesey, as its agent, had owed a duty to protect Rowe and Serpico from criminal acts of third persons committed on the premises because they owned and managed the office park and, therefore, were responsible for maintaining the premises in a reasonably safe condition. They claim this includes an obligation to take reasonable precautions to prevent the criminal acts by third persons on the premises.

Generally, there is no duty requiring a landowner to protect others from criminal activity by third persons on his property absent a "special relationship" between the

parties. (See *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 560; Restatement (Second) of Torts §314 (1965); W. Prosser & W. Keeton, Torts §63, at 442 (5th ed. 1984).) A special relationship has been recognized where the parties are in a position of innkeeper and guest (*Mrzlak v. Ettinger* (1975), 25 Ill. App. 3d 706; *Danile v. Oak Park Arms Hotel, Inc.* (1964), 55 Ill. App. 2d 2), or business invitor and invitee (*Jacobsma v. Goldberg's Fashion Forum* (1973), 14 Ill. App. 3d 710, 712; *O'Brien v. Colonial Village, Inc.* (1970), 119 Ill. App. 2d 105, 106-07; W. Prosser & W. Keeton, Torts §33, at 201-02 (5th ed. 1984)), but this court has repeatedly held that the simple relationship between a landlord and tenant, or a landlord and those on the premises with the tenant's consent, is not a "special" one imposing a duty to protect against the criminal acts of others (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 208; *Phillips v. Chicago Housing Authority* (1982), 89 Ill. 2d 123, 126. See also *Martin v. Usher* (1977), 55 Ill. App. 3d 409, 410-11; *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 99-101).

The plaintiffs argue that this court should impose on a landlord a general duty to protect tenants, and those on the premises with the tenant's consent, from foreseeable criminal activity on the premises.

This argument for a general or inherent obligation of a landlord has been repeatedly rejected by this court. We would observe that although there are courts that have placed such a broad duty upon a landlord to protect tenants from foreseeable criminal acts committed by third parties on the premises (see, *e.g., Trentacost v. Brussel* (1980), 82 N.J. 214, 412 A.2d 436; *Johnston v. Harris* (1972), 387 Mich. 569, 198 N.W.2d 409; *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (D.C. Cir. 1970), 439 F.2d 477), the overwhelming majority of courts, to use the venerable description, have not. (W. Prosser &

W. Keeton, Torts §63, at 442 (5th ed. 1984). See *Feld v. Merriam* (1984), 506 Pa. 383, 485 A.2d 742; *Gulf Reston, Inc. v. Rogers* (1974), 215 Va. 155, 207 S.E.2d 841; *Scott v. Watson* (1976), 278 Md. 160, 359 A.2d 548.) The question here is whether under the circumstances there was such a duty.

The plaintiffs argues that even if Paramount and Fennessey did not have a common law duty to protect Rowe and Serpico from the criminal acts on the premises, they assumed such a duty by instituting a number of security measures at the office park, *inter alia*: covenanting to keep the locks and doors on the buildings in repair; maintaining lighting near the entrance ways to the buildings and in the complex parking lot area; investigating complaints relating to criminal activity at the complex; and otherwise maintaining security devices on the premises.

A landlord may be held liable for the criminal acts of third parties when it "voluntarily undertakes to provide security measures, but performs the undertaking negligently, if the negligence is the proximate cause of injury to the plaintiff." (*Phillips v. Chicago Housing Authority* (1982), 89 Ill. 2d 123, 126; *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 317; *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 209.) This rule is simply an application of the established principle, recognized in section 324 of the Restatement (Second) of Torts (1965), that one who has voluntarily undertaken to provide a service must do so with reasonable care. Our holding in *Pippin* reflected section 324A of the Restatement, which states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for

physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Restatement (Second) of Torts §324A, at 142 (1965).)

We noted in *Pippin* that the rationale for subsection (c) was expressed in the Restatement comments:

" 'Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk.' (Restatement (Second) of Torts sec. 324A, comment e (1965).)" *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 211.

See also *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 390.

The plaintiffs have not shown that Paramount or Fennessey did anything which can be reasonably considered as constituting a voluntary assumption of protecting Rowe and Serpico from the criminal acts of third persons on the premises. On the contrary, in the lease Paramount specifically disclaims responsibility for protecting its tenants or their property from criminal acts. While the plaintiffs claim that Paramount agreed to keep the door locks to J-Mar's offices in repair, there is nothing in the record to substantiate their claim. Too, although Paramount may have provided illumination in the common areas, the furnishing of outside lighting is commonplace and furnished by virtually every landlord to every tenant in a facility such as is involved here. It cannot reasonably be regarded as the assumption of a duty to protect against criminal acts. In any event, even if Paramount had undertaken to perform such services, its

duty was limited by the extent of the undertaking, *viz*, to use reasonable care in providing the necessary lighting and assuring that the locks were in working order. (See *Pippin v. Chicago Housing Authority* (1970), 78 Ill. 2d 204, 210.) The plaintiffs have presented no evidence, however, that the door locks to J-Mar's offices were not functioning properly on the night Rowe and Serpico were assaulted, or that the lighting in the common areas was inadequate.

It is also plaintiffs' contention that Fennessey voluntarily assumed a duty to protect against criminal acts because he responded to a call from a woman working at the office park on the day Rowe and Serpico were assaulted and went to the office park to investigate. Fennessey cannot be held to such a duty simply because he investigated whether an allegedly unauthorized individual was on the premises of the office park. In any event, there is no evidence that he performed the investigation negligently. Fennessey testified that he went to the office park, determined that the man was no longer in the building and checked the doors to make sure they were secure. While the plaintiffs claim that Fennessey should have called the police and informed them of the possible trespasser, in view of the fact that the individual did not appear to be committing a crime or acting in a disturbing manner, Fennessey was not remiss in not notifying the police.

The plaintiffs further maintain that Paramount assumed a duty to take reasonable precautions to prevent intruders from entering tenants' offices on the ground that, under the lease, it was given exclusive control over what security devices, including the office door locks, could be installed on the leased premises. The lease provides in that respect:

> "The Lessor may enter said premises at all reasonable times for the purpose of making such repair or altera-

tions therein as it shall deem necessary for the safety, preservation or improvement of said premises or said building. The Lessee will make no alterations in or additions to said premises without first obtaining the Lessor's written consent ***.

\* \* \*

### RULES AND REGULATIONS

\* \* \*

*** No additional locks shall be placed upon any doors of the premises and Lessees shall not permit any duplicate keys to be made (all necessary keys will be furnished by the Lessor), but if more than two keys for any door lock are desired, the additional number must be paid for by the Lessees. Upon the termination of this lease the Lessees shall surrender all keys of the premises and of the building and give to the Lessor the explanation of the combination of all locks on vault doors in the premises."

The plaintiffs argue that because of Paramount's exclusive control over the installation of security devices, Rowe and Serpico were unable to provide for their own protection; they were dependent on Paramount to provide the necessary protection against criminal intrusions. Therefore, they assert, Paramount should be held to a duty to maintain the office door locks and other security devices in a reasonably safe condition and held liable for damages caused by criminal intruders who gain entry to the premises because of inadequacies Paramount knew or should have known existed in the locks or other security devices.

It is axiomatic that if a landlord retains control of a portion of the premises leased to the tenant it has the duty, as the party in control, to use ordinary care in maintaining that part of the premises in a reasonably safe condition. (*Drewick v. Interstate Terminals, Inc.* (1969), 42 Ill. 2d 345; *Murphy v. Illinois State Trust Co.* (1940), 375 Ill. 310.) Conversely, a landlord is not liable for injuries caused by a defective condition on the prem-

ises leased to a tenant and under the tenant's control. (*Wright v. Mr. Quick, Inc.* (1985), 109 Ill. 2d 236, 238; *Wagner v. Kepler* (1951), 411 Ill. 368, 371.) As Dean Prosser observed, "[t]he lessee acquires an estate in the land, and becomes for the time being both owner and occupier, subject to all of the responsibilities of one in possession, to those who enter upon the land and those outside of its boundaries." W. Prosser & W. Keeton, Torts §63, at 434 (5th ed. 1984).

Contrary to the plaintiffs' assertions, Paramount did not exercise exclusive control over what security devices J-Mar could install on the leased premises: control was shared between Paramount and J-Mar. The lease simply prohibited J-Mar from altering the door locks or other security devices on the office space without first obtaining Paramount's permission. There is nothing to suggest that if a request had been made, it would have been refused. It cannot reasonably be argued therefore that Paramount deprived Rowe and Serpico of the ability to protect themselves against criminal intruders to such a degree that the law will impose a duty on Paramount and Fennessey to ensure that the locks were sufficient to prevent criminal intrusions. In any event, as stated, the record shows that the door locks to J-Mar's offices were functioning properly on the night of the assault.

The plaintiffs correctly assert that Paramount, by retaining access to the individual office units and manufacturing master and grandmaster keys to facilitate entry, assumed a duty to take reasonable precautions to prevent unauthorized entries by individuals possessing those keys. (See *Kendall v. Gore Properties, Inc.* (D.C. Cir. 1956), 236 F.2d 673, 678; *Smith v. General Apartment Co.* (1975), 133 Ga. App. 927, 213 S.E.2d 74.) (The record shows that master and grandmaster keys were outstanding and were not accounted for. There was created the risk to those on the premises of the office park of

unauthorized entries by those with master or grandmaster keys in their possession.) J-Mar, and those on the leased premises with its consent, had a right to rely upon Paramount and its agents to exercise reasonable care over who was given keys and to take preventive measures to ensure that individuals who were given keys would not make unlawful use of them.

Illustrative of this is *Kendall v. Gore Properties, Inc.* (D.C. Cir. 1956), 236 F.2d 673, 678. In *Kendall*, the plaintiff brought a wrongful death action against the defendant, the company which owned and managed an apartment complex where the plaintiff's decedent was murdered by one of the defendant's employees. The plaintiff alleged that the defendant was negligent in failing to control or supervise the employee while he was painting the decedent's apartment and in giving him a key and unrestricted access to her apartment. In reversing the trial court's judgment directing a verdict in favor of the defendant, the court stated:

> "The locks were obviously for the protection of the tenant, living alone, that she might be as secure against intruders as reasonable precautions made possible. She had a lease pursuant to which she paid for shelter and protection. She had one set of keys for herself; another set was retained by the landlord. She was entitled to assume that appellees would introduce no intruder into her apartment. She had a right to expect that the landlord would not give up his set of keys to a stranger or so negligently fail to guard them that they might fall into the hands of one bent on mischief." 236 F.2d at 678.

There is evidence in the record here that raises a genuine issue of material fact as to whether proper control was maintained over the distribution of master and grandmaster keys, and as a proximate result, Free obtained a key which he used to enter the offices where he attacked Rowe and Sepico. Robert Davis, a maintenance

engineer at the office park, declared in an affidavit that to his knowledge no records were kept of who was given master or grandmaster keys or whether they were ever collected. While there is no evidence in the record that Free was ever given a key, it would not be unreasonable to infer from the record that he used a key to enter J-Mar's office. Davis testified that during the time Free was employed by Stahelin at the office park, sometime in 1972 or 1973, he saw Free several times on the premises of the office park with a set of "masterkeys" in his possession. Free was also seen inside other buildings at the office park several times on the day of the crimes, and on one occasion, Mally Heaton saw him entering building No. 4 with a set of keys in his possession.

There is no evidence in the record, however, that Paramount or its agents were negligent in failing to maintain proper control over the master and grandmaster keys which possibly enabled Free to gain access to a key. They were aware, nonetheless, of the risk posed by the outstanding master and grandmaster keys, having been informed by Davis that keys were outstanding and that they were unaccounted for. Fennessey not only had appreciation of the risk but was the only party in a position to guard against it. Under these circumstances, we consider that Fennessey had a duty either to warn those rightfully on the premises of the danger or to take reasonable precautions to prevent foreseeable unauthorized entries by those with a master or grandmaster key. (See *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 98; *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551.) Having failed to do so, they breached their duty and can be held responsible for the reasonably foreseeable criminal acts of third persons which are proximately caused by their negligence.

Paramount and Fennessey argue that even if they were negligent in failing to take precautions against un-

authorized entries by those possessing the outstanding master and grandmaster keys that the criminal acts constituted an "independent intervening cause" of the plaintiffs' injuries which operated to insulate them from liability.

Generally, where between the defendant's negligence and the plaintiff's injury an independent, illegal act of a third person has intervened which causes the plaintiff's injury, and without which it would not have occurred, the criminal act is a superseding cause of injury relieving the originally negligent party of liability. (See W. Prosser & W. Keeton, Torts §33, at 201 (5th ed. 1984).) There is an exception where the defendant's acts or omissions create a condition conducive to a foreseeable intervening criminal act. If the criminal act is reasonably foreseeable at the time of the negligence, the causal chain is not necessarily broken by the intervention of such an act. (*Lillie v. Thompson* (1947), 332 U.S. 459, 462, 92 L. Ed. 73, 75, 68 S. Ct. 140, 142; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 80; *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88. See also Restatement (Second) of Torts §§302B, 448, 449 (1965).) Thus, a landlord may be held liable for harm to a tenant, or those on the premises with the tenant's consent, if its negligence facilitates the criminal acts of a third person and the criminal activity is reasonably foreseeable. *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313; *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 97; *Mims v. New York Life Insurance Co.* (1971), 133 Ill. App. 2d 283; *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551.

For example, in *Mims*, the plaintiffs were tenants who were about to vacate their apartment at the termination of their lease. Without giving notice to the tenants, the landlord's employee made an inspection of the premises and left the tenant's door ajar. Upon returning, the plaintiffs discovered that some of their possessions

were missing and that the door was unlocked though she locked it before her departure. In holding for the plaintiffs, the court stated that the defendant's employee, having unlocked the plaintiffs' door to inspect the premises, had a duty to lock the door and his failure to do so was a proximate cause of the theft.

In *Stribling*, the plaintiffs' apartment was burglarized on three occasions. Each time the burglars entered by breaking through a wall connecting the plaintiffs' apartment with an adjacent apartment. The plaintiffs alleged that the Chicago Housing Authority had allowed free access to the vacant apartments and had failed to seal them after being notified that the plaintiffs' apartment had been burglarized by individuals who broke through the wall of one of the adjacent apartments. In imposing liability on the Authority, the court held that it was negligent in failing to seal the vacant apartments, which reasonably would have prevented further thefts in this manner. See also *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 97; *Day v. Castilow* (La. App. 1981), 407 So. 2d 510, 511; *Braitman v. Overlook Terrace Corp.* (1975), 68 N.J. 368, 346 A.2d 76; *De Lorena v. Slud* (1949), 95 N.Y.S.2d 163; *Smith v. General Apartment Co.* (1975), 133 Ga. App. 927, 930, 213 S.E.2d 74, 77; *McCappin v. Park Capitol Corp.* (1956), 42 N.J. Super. 169, 126 A.2d 51; *Prager v. City of New York Housing Authority* (N.Y. Civ. Ct. 1982), 112 Misc. 2d 1034, 447 N.Y.S.2d 1013.

As stated, from the record it is a reasonable inference that Free's entry into J-Mar's office was facilitated by the failure to take precautions to guard against unauthorized entries by those with master or grandmaster keys. Consequently, if the intrusion by Free was reasonably foreseeable, Paramount and Fennessey should be held liable for damages proximately caused by the crimes.

It is Paramount and Fenneseey's contention, however, that the appellate court correctly held that the criminal attack on Rowe and Serpico was unforeseeable, as a matter of law, and therefore they did not owe a duty to guard against it. They say that although they might have had notice that master and grandmaster keys were outstanding, it was not foreseeable that an individual would use one and enter a tenant's office and assault those present, particularly in light of the fact that there had not been any violent crimes at the office park in the past. Therefore an assault of this magnitude was clearly unforeseeable. On the record the contention is not convincing.

According to the affidavit of Chief Mullaney, there were 17 incidents of criminal activity at the complex in the preceding two years. Though most were or involved minor thefts from the parking lot area, other affidavits the plaintiffs submitted showed that several of the incidents involved burglaries from offices where there were no signs of forced entry. Fennessey was aware at the same time that master and grandmaster keys were outstanding and unaccounted for. Too, Officer Velon stated in an affidavit that after investigating two of the reported burglaries he told Fennessey to change the office door locks at the office park. We consider that knowledge that master and grandmaster keys were outstanding and unaccounted for and that a number of burglaries were committed on the premises that showed no sign of forced entry raised a genuine issue of material fact as to whether a reasonable person should have foreseen a connection between the fact of outstanding keys and the past criminal activities and the danger or risk of similar crimes in the future and would have taken reasonable precautions to guard against it.

Too, even though there had not been previous crimes of violence at the office park, where a plaintiff's injury results from the same risk, the existence of which required the exercise of greater care, unforeseeability of what exactly could develop and the extent of the injury or loss will not limit liability. *Nelsen v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 655, 660-63; *Petition of Kinsman Transit Co.* (2d Cir. 1964), 338 F.2d 708; W. Prosser & W. Keeton, Torts §43, at 283 (5th ed. 1984).

Under the circumstances here the crimes were within the scope of the foreseeable risk created by the inadequate control with regard to the master and grandmaster keys. The purpose of having secure locks is to prevent entries by intruders and the accompanying criminal conduct. Although burglary standing alone is a crime against property interests, it also involves a high risk of personal injury or death if the intruder is confronted. (See *People v. Bales* (1985), 108 Ill. 2d 182, 194; *Galloway v. Bankers Trust Co.* (Iowa 1988), 420 N.W.2d 437, 440; *Jardel Co. v. Hughes* (Del. 1987), 523 A.2d 518, 525.) Fennessey was aware that persons would be working at the office park late at night and therefore would be vulnerable to an attack if they encountered or were exposed to an intruder. Consequently, simply because no violent crimes had been committed at the office park does not render the criminal actions here unforeseeable as a matter of law.

Although the foreseeability of a plaintiff's injury is important in the determination of whether a duty exists, the imposition of a duty does not depend upon foreseeability alone. As Dean Prosser stated, "[I]t should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." (W. Prosser & W.

Keeton, Torts §54, at 358 (5th ed. 1984). See also *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 356.) Whether a duty exists depends on a consideration of the likelihood of injury, the magnitude of the burden to guard against it, and the consequences of placing that burden upon the defendant. *Lance v. Senior* (1967), 36 Ill. 2d 516, 518.

Providing adequate security measures would have been relatively inexpensive. The office space in the park could have been secured simply by "rekeying" the locks, which according to the record would cost $2,500. The risk of unauthorized entry could also have been avoided by notifying those on the premises of the danger. In light of the risks created, it would not have been an unreasonable burden for Paramount to assume.

We judge that the circumstances here create a triable issue of fact as to whether the danger of criminal conduct by individuals possessing passkeys was sufficiently probable and predictable to create a duty upon the defendants to take reasonable precautionary measures, and whether their failure to do so was a proximate cause of the plaintiffs' damages. The trial court erred in granting Paramount and Fennessey summary judgment.

The plaintiffs also argue that the appellate court erred in affirming the dismissal of Stahelin on summary judgment. They say that Stahelin had notice of the unreasonably dangerous condition with respect to the outstanding master and grandmaster keys and was negligent in failing to notify Paramount of the dangerous condition.

In general, a grantor or vendor of real property is not liable for personal injuries sustained by the vendee or other third persons on the premises subsequent to his transfer of possession and control. (Restatement (Second) of Torts §352 (1965); *Sparling v. Peabody Coal Co.* (1974), 59 Ill. 2d 491, 494; *Century Display Manufactur-*

*ing Corp. v. D. R. Wager Construction Co.* (1978), 71 Ill. 2d 428, 433; *Anderson v. Cosmopolitan National Bank* (1973), 54 Ill. 2d 504, 507.) This, however, is subject to an established exception when the vender actively conceals or fails to reveal a dangerous condition to the vendee. Section 353 of the Restatement provides:

> "A vender of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if
>
> (a) the vendee does not know or have reason to know of the condition or the risk involved, and
>
> (b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk." Restatement (Second) of Torts §353, at 235 (1965).

Section 353(2) adds that liability continues until the vendee discovers the condition and has a reasonable opportunity to guard against it or until the buyer has had a reasonable opportunity to discover the condition and guard against it.

Davis' affidavit establishes that he informed Fennessey, his supervisor at Paramount, of the problem with the master and grandmaster keys in advance of the crimes involved here and that Fennessey had rejected the idea of rekeying the locks to render the outstanding master and grandmaster keys inoperative. Paramount, therefore, had adequate notice of the defect and opportunity to correct it. Consequently, under section 353, Stahelin could no longer be held liable for injuries caused by defects existing on the premises after surrendering possession.

For the reasons given, the judgment of the appellate court is affirmed as to the dismissal of Stahelin on summary judgment, it is reversed as to Paramount and Fennessey and the cause is remanded to the circuit court of Du Page County for further proceedings.

*Appellate court affirmed in part and reversed in part; cause remanded.*

JUSTICE STAMOS took no part in the consideration or decision of this case.