36 F.3d 588
 Prod.Liab.Rep. (CCH) P 14,073
Cheryl GARRISON, Special Administrator of the Estate of
William Tab Garrison, Deceased, Plaintiff-Appellant,
v.
GOULD, INCORPORATED, ABB Power T & D Company, Incorporated
and ABB Asea Brown Boveri, Incorporated,
Defendants-Appellees,
and
OIL TECHNOLOGY GROUP, Defendant-Third/Party Plaintiff-Appellant,
v.
SHELL OIL COMPANY, Third/Party-Defendant-Appellee.
 Nos. 93-2696, 93-2697 and 93-2799.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 11, 1994.
Decided Sept. 21, 1994.
 
 Gary W. Finch, Endicott & Finch, Carmi, IL, Robert H. Howerton, Harris, Lambert, Howerton & Dorris, Marion, IL (argued), for Cheryl Garrison.
 Edwina Warner, Troutt, Alexander, Popit & Warner, Benton, IL (argued), for Gould, Inc., ABB Power T & D Co., Inc., and ABB Asea Brown Boveri.
 Ronald A. Roth (argued), David Wayne Vandeburgt, Bernard & Davidson, Granite City, IL, for Oil Technology Group.
 Al J. Pranaitis (argued), C. Raymond Bell, Hoagland, Fitzgerald, Smith & Pranaitis, Alton, IL, for Shell Oil Co.
 Before CUDAHY and FLAUM, Circuit Judges, and SHARP, District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Tab Garrison, Cheryl Garrison's husband, was killed in June 1990 while working on electrical equipment in an oil field owned by Oil Technology Group ("OTG"). Cheryl Garrison sued to recover damages from OTG and from the successors in interest of the electrical switch maker (referred to collectively as "Gould") whose product purportedly caused the injury.[1] OTG then sought contribution from Shell Oil Company ("Shell"), the original owner of the oil field. The district court entered summary judgment in favor of the successors to the switch maker on the ground that the Illinois statute of repose, 735 ILCS 5/13-214(b), barred Garrison's claim. The court also entered summary judgment in favor of Shell, holding that OTG failed to show that Shell owed a duty to the deceased.[2] We reverse the judgment with respect to Gould and affirm the judgment in favor of Shell.
 
 I.
 
 2
 In the late 1950's, Shell arranged to have an electrical supply system built to provide power for pumps and other extraction equipment in an oil field, known as the Rural Hill Flood Unit. Shell did not itself participate in the construction of the electrical system. Rather, the switch allegedly causing the injury passed by purchase through the hands of at least two intermediary supply companies before it was installed in Shell's system by an outside contractor. Further, there is testimony that Shell did not itself perform maintenance on the switch in question or other switches when it owned the oil field. In 1982, Shell sold the oil field to Oil Technology Group.
 
 
 3
 The electrical system of the oil field included a four-pole distribution or switching station. The switches at the switching station were manufactured and sold by ITE Circuit Breaker Company in the 1950's. In 1968, ITE Circuit Breaker merged with Imperial Eastman Corporation to form ITE Imperial Corporation. In 1976, Gould, Inc. acquired ITE Imperial as a wholly-owned subsidiary. About four years later, Gould's high-voltage products division changed hands and its assets were eventually purchased by ABB Power T & D Company, Inc., a wholly-owned subsidiary of Asea Brown Boveri, Inc. Neither the maker of the indicated switch nor its successors in interest came to the oil field to install the switches. Indeed, testimony revealed that the switches' components were shipped to the oil field unassembled, where the installer put them together. Def. Ex. 4 at 106-07.
 
 
 4
 On June 19, 1990, Tab Garrison, an electrician and plaintiff's husband, threw one of the switches located at the switching station to turn off the power so that he could work on an electrical pole. Apparently because the switch he threw malfunctioned, he came in contact with a power supply line and was fatally electrocuted. Cheryl Garrison brought this action.
 
 II.
 
 5
 We review the grant of summary judgment de novo. We, of course, affirm the district court's decision only if, viewing the record and all inferences drawn from it in the light most favorable to the non-movant, there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Kralman v. Illinois Dept. of Veterans' Affairs, 23 F.3d 150, 152 (7th Cir.1994).
 
 A. Summary Judgment in Favor of Gould
 
 6
 The Illinois statute of repose provides in relevant part:
 
 
 7
 No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.
 
 
 8
 735 ILCS 5/13-214(b). There is no dispute that ten years have elapsed since the conduct upon which Gould bases its statute of repose defense occurred. Garrison acknowledges that the switch in question was installed when the oil field switching station was constructed in the late-1950's--decades before the deceased was accidentally electrocuted. Consequently, the only issue with respect to the summary judgment in favor of Gould is whether Gould is otherwise entitled to take advantage of the statute. In particular, whether the statute applies turns on whether the switch at issue is an "improvement to real property" and whether Gould engaged in activities that fall within the ambit of Sec. 13-214(b).[3]
 
 1. Improvement to Real Property
 
 9
 Whether an item is an "improvement to real property" is a question of law, though its resolution involves numerous questions of fact. Herriott, 998 F.2d at 489 (citing St. Louis v. Rockwell Graphic Sys., 153 Ill.2d 1, 178 Ill.Dec. 761, 762, 605 N.E.2d 555, 556 (1992)). In St. Louis v. Rockwell Graphic Systems, the Illinois Supreme Court attempted to define the term "improvement to real property," looking first to the Black's Law Dictionary definition of "improvement":
 
 
 10
 A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes.
 
 
 11
 178 Ill.Dec. at 762, 605 N.E.2d at 556. The court then specified certain criteria for determining what constitutes an improvement to real property: (1) whether the addition was intended to be permanent or temporary; (2) whether it became an integral component of the over-all system; and (3) whether the value and use of the property was enhanced. Id. This circuit and the Illinois appellate courts have also noted that the application of Sec. 13-214(b) should focus on the entire construction project and not merely on a single component of the system. Herriott, 998 F.2d at 490; see also Hilliard v. Lummus Co., Inc., 834 F.2d 1352, 1356 (7th Cir.1987) ("[I]f a component is an essential or integral part of the improvement to which it belongs, then it is itself an improvement to real property."); Kleist, 156 Ill.Dec. at 841-42, 571 N.E.2d at 821-22 (same).
 
 
 12
 The switch in question here was installed along with the rest of the electrical switching station and the installation of this equipment amounts to more than a mere repair or replacement. The purpose of the switching station--to help provide power for the oil field extraction equipment--indicates that its installation was meant to be permanent, and there is no evidence to the contrary. Further, the switch itself controlled the flow of current through the system and it was thus integral to that system. Finally, Shell installed the switch and electrical system so that it could extract oil to be refined or sold. Thus, the system added value to the property. On these facts, we conclude that the switch in question was an improvement to real property within the meaning of Sec. 13-214(b).
 
 2. Class Protected by the Statute
 
 13
 The second aspect of the inquiry concerns whether Gould participated in any of the activities protected under Sec. 13-214(b).[4] The first clause of the section recites those protected activities and places them in a certain context: "No action based upon tort ... may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction." Sec. 13-214(b) (emphasis added). The concluding phrase, "of construction," modifies each of the enumerated activities and not merely the final one.[5] Hence, the statute should be construed to mean, inter alia, that it protects the activities of persons engaged in the "design of construction." When, as in the case before us, the defendant-manufacturer has not participated directly in construction, courts have focused on whether the manufacturer's product is custom-made or standardized. "To be included within the statute, a manufacturer must perform some role related to the construction site beyond provision of standard products generally available to the public and not custom designed for the project. Were this not so, a manufacturer's exposure to liability for a defective product would rest solely on the fortuity of its incorporation in an 'improvement to real property'...." People v. Asbestospray Corp., 247 Ill.App.3d 258, 186 Ill.Dec. 462, 467-68, 616 N.E.2d 652, 657-58 (1993); see also Witham, 975 F.2d at 1346 (citing Blaske v. Smith & Entzeroth, Inc., 821 S.W.2d 822, 837 (Mo.1991)). It generally follows that, if Gould's switch is found to be a standard product, Gould did not engage in activities protected by the statute.
 
 
 14
 Gould claims that it "specially custom made" the switch according to specifications provided by the builders of the switching station. Br.Appellees at 36. But the switch was designed about 1955--approximately three to four years before the one in question was purchased and installed. Also about 1955, the switch in question was patented and issued a serial number, further suggesting that the switch was a standardized product. Moreover, the switch was included in a catalogue, from which customers could order it. Def. Ex. 4 at 5, 8, 17. On these facts, it seems clear that the switch in question was not designed with the Rural Hill oil field in mind. Therefore, the switch was not custom-made. Notwithstanding the fact that it was an improvement to real property, the defendants do not fall within the protection of Sec. 13-214(b) as a matter of law. Hence, summary judgment was improper.[6]
 
 B. Summary Judgment in Favor of Shell
 
 15
 OTG's third-party complaint against Shell sought contribution based on Shell's failure to warn OTG of the need for periodic maintenance and care of the electrical switch in question. Under Illinois law, a seller of land is generally not liable for physical harm suffered by persons on the land resulting from any dangerous condition that existed when the purchaser took possession. Rowe v. State Bank of Lombard, 125 Ill.2d 203, 126 Ill.Dec. 519, 531, 531 N.E.2d 1358, 1370 (1988) (adopting Secs. 352-353 of the Second Restatement of Torts); Restatement (Second) of Torts Sec. 352. When certain requirements are met, however, a vendor who conceals or fails to disclose any condition that involves a reasonable risk of harm to persons on the land may be held liable for injuries occurring on the land even after it has been sold. These requirements include (1) that the purchaser of the land have known or have reason to have known of the dangerous condition or the risk involved; (2) that the seller have known or have reason to have known of the condition; (3) that the seller realize or have reason to realize the risk involved; and (4) that the seller have reason to believe that the vendee will not discover the condition or realize the risk. Restatement (Second) of Torts Sec. 353. When the plaintiff establishes that these four requirements are met, the vendor owes a duty of disclosure to the vendee, to others present on the land with the vendee's consent and to sub-vendees. Id.
 
 
 16
 As an electrician working on the oil field's electrical equipment, the deceased was on the land with OTG's consent. Thus he is a proper plaintiff for purposes of Sec. 353. Yet Shell contends that it should not be held liable for contribution. Shell reasons that the dangerous condition that caused Tab Garrison's death was the broken, malfunctioning switch--a condition which arose several years after Shell transferred control of the switch and oil field to OTG. Lacking evidence that there was a problem with the switch when the field was sold, Shell contends, the court correctly found that Shell owed no duty to the deceased and thus it should not have to share with OTG any burden of compensating the deceased. OTG, on the other hand, contends that the dangerous condition did, in fact, exist when the oil field was sold. That condition involved a risk of injury resulting from use of the electrical switch without proper maintenance.
 
 
 17
 Like the district court, we decline to reach the question whether Shell or OTG offers the better explanation of the dangerous condition. It is enough to note that OTG has not presented enough evidence to block Shell's motion for summary judgment under either theory. OTG has failed to present any evidence that the switch was broken when OTG purchased the oil field. Even Gould's expert stated that he believed that the switch had broken fairly recently--either the last time it was closed or when it was opened immediately before the accident. ROA Doc. 80 at 8-9; Shell Supp.App. at 104-05. Further, the expert had no opinion as to whether whatever deterioration that led to the switch's failure could have begun more than two years before the accident. Shell Supp.App. at 122-23. Thus, OTG cannot prevail under a theory that the dangerous condition arose only at the time the switch was broken.
 
 
 18
 Similarly, the only evidence that OTG presented regarding Shell's knowledge of and failure to communicate the need to maintain the switch is testimony merely suggesting that a leaflet may have been provided to the original purchaser of the switch.[7] However, this evidence satisfies the requirements of Sec. 353 only if several other assumptions are made, namely, that the leaflet was actually received and understood by Shell, that the leaflet was not passed to OTG when it acquired the oil field and that Shell had reason to believe OTG would not realize the need for periodic maintenance. On the facts before us, it is especially difficult to assume that Shell understood that it needed to perform maintenance on the switch: discovery yielded no "warning" documents that might have accompanied the switch; Shell neither purchased nor installed the switch; and there is testimony that Shell did not itself perform maintenance on the switches when it owned the oil field. Thus, there was no material factual dispute and summary judgment in favor of Shell was proper.
 
 III.
 
 19
 For the foregoing reasons, summary judgment in favor of Gould is REVERSED and REMANDED for further proceedings not inconsistent with this opinion. Summary judgment in favor of Shell on OTG's contribution claim is AFFIRMED.
 
 
 
 *
 The Honorable Allen Sharp, Chief Judge, of the United States District Court for the Northern District of Indiana is sitting by designation
 
 
 [1]
 These successors include Gould, Inc., ABB Power T & D Co. and ABB Asea Brown Boveri, Inc
 
 
 [2]
 Garrison's case against the current owner of the oil field, OTG, is stayed pending this appeal
 
 
 [3]
 This two-part inquiry reflects the courts' reluctance to apply this and similar statutes of repose where the defendant manufactured a product that became part of an improvement to real property but was otherwise uninvolved with the project. Witham v. Whiting Corp., 975 F.2d 1342, 1346 (7th Cir.1992). Indeed, in most of the cases in which the defendant received the protection of the Illinois statute of repose, the defendant also performed work at the construction site. See, e.g., Cates v. Hunter Eng'g Co., 205 Ill.App.3d 587, 151 Ill.Dec. 133, 563 N.E.2d 1239 (1990) (defendant who designed, built and assisted in installing rolling mill protected by statute); Cross v. Ainsworth Seed Co., 199 Ill.App.3d 910, 145 Ill.Dec. 927, 557 N.E.2d 906 (Ct.1990) (manufacturer and installer of conveyer belt protected by statute); Kleist v. Metrick Elec. Co., 212 Ill.App.3d 738, 156 Ill.Dec. 839, 571 N.E.2d 819 (1991) (installer of electrical system under statutory protection); Neofotistos v. Metrick Elec. Co., 217 Ill.App.3d 506, 160 Ill.Dec. 381, 577 N.E.2d 511 (1991) (installer of electric panel and circuit breaker protected by statute); Herriott v. Allied Signal, Inc., 998 F.2d 487 (7th Cir.1993) (designer, manufacturer and installer of larry-car insulated by statute); Witham, 975 F.2d 1342 (manufacturer of crane which inspected the crane after installation but did not install it was protected by statute); Hausman v. Monarch Mach. Tool Co., 997 F.2d 351 (7th Cir.1993) (designer and manufacturer of anneal line which did not install the line but did supervise the installation was protected). Note, however, that none of these cases has actually held that defendants who do not work at the construction site cannot, as a matter of law, raise the statute of repose defense
 For analyses of other states' statutes of repose, see Baker v. Walker & Walker, Inc., 133 Cal.App.3d 746, 184 Cal.Rptr. 245 (1982) (manufacturer and supplier of heating and cooling units not within statutory protection); Becker v. Hamada, Inc., 455 A.2d 353 (Del.1982) (supplier of roofing materials not protected by statute); Dighton v. Federal Pacific Elec. Co., 399 Mass. 687, 506 N.E.2d 509 (designer, manufacturer and supplier of circuit breaker not protected by statute of repose), cert. denied, 484 U.S. 953, 108 S.Ct. 345, 98 L.Ed.2d 371 (1987).
 
 
 [4]
 As we observed in Hausman, the list of protected activities is notably disjunctive, and therefore, Gould falls within the protected class if it engaged in any one of the listed activities. 997 F.2d at 353
 
 
 [5]
 This reading of Sec. 13-214(b) is consistent with the intent of the statute of repose, which the legislature enacted to protect parties involved with construction activities on real property--particularly architects, construction companies, and engineers--from what the courts had, before the statute, effectively made perpetual liability for physical injury occurring on the property. See generally C.S. Johnson Co. v. Champaign Nat'l Bank, 126 Ill.App.3d 508, 81 Ill.Dec. 663, 467 N.E.2d 363 (1984) (quoting legislators); see also Witham, 975 F.2d at 1347
 
 
 [6]
 In her brief, Garrison moves that we certify to the Illinois Supreme Court the question whether a manufacturer who engages in no activity on the construction site and who does no particularized and specialized act relating to the project is protected by the statute of repose. As our analysis indicates, however, the Illinois case law provides adequate guidance for us to resolve this case under the existing record. Garrison's motion for certification is therefore denied
 
 
 [7]
 The person who testified that the leaflet may have even existed had no specific recollection of any special instructions that accompanied the switches when sold, only a general belief that maintenance leaflets went to buyers with the switches. ROA Doc. 80 at 9