Fourth Division
August 19, 2010

No. 1-08-0248

| | | |
|---|---|---|
| ROBERT SANCHEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 05 L 1640 |
| | ) | |
| WILMETTE REAL ESTATE AND MANAGEMENT, | ) | |
| COMPANY, an Illinois Corporation, and BCH5900, LLC, | ) | |
| an Illinois Limited Liability Company, | ) | Honorable |
| | ) | Marcia Maras, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

The plaintiff, Robert Sanchez, was injured during an alleged attack by an unknown assailant

at an apartment complex owned by one defendant, BCH5900, LLC ("BCH"), and managed by the

other defendant, Wilmette Real Estate and Management Co. ("WREM"). The defendants filed a

motion for summary judgment, and the trial court granted the defendants' motion. On appeal, the

plaintiff contends that the trial court erred in granting the defendants' motion for summary judgment

because the defendants owed various duties to the plaintiff. For the following reasons, we affirm the

trial court's order granting the defendants' motion for summary judgment.

BACKGROUND

On February 10, 2005, the plaintiff filed a complaint and alleged that the defendants were

negligent. The plaintiff alleged that he rented one of the 46 apartment units in a building owned by

BCH and managed by WREM. The plaintiff further alleged that it was the defendants' policy to leave vacant apartment units unlocked. The plaintiff alleged that on November 28, 2004, at approximately 10:30 p.m., he heard a noise coming from vacant apartment B2. The plaintiff further alleged that he was "violently attacked" by an unknown individual who exited apartment B2 and followed him up the stairs.

On September 20, 2007, the defendants filed a motion for summary judgment and argued that there was no special relationship between the parties and that the alleged attack was not foreseeable. The defendants attached the complaint and the answer to their motion for summary judgment. The defendants also attached the depositions of the following persons to their motion for summary judgment: Roberto Sanchez, Vilnis Birnbaums, Cameel Halim, Dzemil Hameel Fejzulai, Kaydime Fejzulai, Elisa Wolter, Michael Z. Wolter, Alma Shero, and Artemio Villafana.

Sanchez testified at his deposition that in order to gain entry into the apartment building, a person had to walk through a courtyard and unlock the first door with a key. There was also a second door in the building, but it was not locked. A visitor to the building would have to be buzzed in. There was also a entryway in the back of the building, but the back door did not work most of the time. On November 28, 2004, at 12 a.m., he returned to the apartment building and as he walked through the courtyard, he observed someone standing in the window of one of the vacant apartments. The plaintiff walked to the building entrance, used his key to gain entry into the building, and began walking up the stairs to his apartment. The plaintiff heard noises coming from apartment B2 and, through the crack below the door, he observed someone standing behind the door looking out the peephole. The plaintiff testified that the door to apartment B2 opened and he observed a man exit

apartment B2. When the plaintiff reached his apartment, he was hit on his head and body. The plaintiff began to scream and the attacker ran away.

Sanchez further testified at his deposition that his roommate exited the apartment, gave the plaintiff a towel, and called the police and the plaintiff's cousin. When the police arrived, they searched apartment B2 and found that the front and back entrances of the apartment were open. The plaintiff was taken to the hospital, where he remained for a couple of days.

Birnbaums testified at his deposition that he was the plaintiff's roommate. Birnbaums explained that in order to access the apartment building, you have to walk through the courtyard, through the unlocked exterior door, enter a small vestibule containing mailboxes and entrance buzzards, and insert your key into the second entrance door. Each unit also has a rear exit that is accessible by a wooden staircase. The rear entrance has a metal gate, which was often "propped open or the lock was malfunctioning."

Birnbaums further testified at his deposition that on November 28, 2004, he heard the plaintiff return to the apartment between 10:30 and 11:30 p.m. Birnbaums opened the apartment door and observed the plaintiff with blood on him. Birnbaums testified that he observed the plaintiff and the police enter apartment B2 through an unlocked apartment door. Birnbaums testified that he did not observe the rear gate on November 28, 2004, and he did not recall that the front lock was malfunctioning on November 28, 2004.

Halim testified at his deposition that he is the president of WREM. WREM performs every aspect of managing the building, including hiring the janitors, managers, and staff of the buildings; collecting the rent; leasing the apartments; paying the bills; marketing the property to prospective

tenants; and responding to the tenants' complaints. In October 2004, Kaydime Fejzulia became the on-site manager of the property and was responsible for living in the building, showing vacant apartments to prospective tenants, collecting the rent, preparing the units for rent, performing repairs, keeping the building clean, and cutting the grass. Halim testified that WREM does not have a written policy regarding leaving vacant units unlocked in order to allow easy access to prospective tenants.

Kaydime testified at her deposition that she has been the property manager since September 2004. She rents the apartments, cleans the apartments before and after a tenant moves, changes the locks, shows vacant apartments to prospective tenants, responds to the tenants' complaints, and checks the doors and gates. She also keeps unwanted people off the property. Kaydime testified that the people who work in the building lock the doors "all the time," that the manager checks the locks on the doors to vacant apartments, and that her supervisor told her to keep the vacant units locked. She never told anyone that it was her policy to keep vacant units unlocked so that it was easier to show the apartments to prospective tenants. Kaydime testified that the locks on apartment B2 were changed on November 1, 2004, and that apartment B2 was vacant and locked on November 28, 2004.

Dzemil testified at his deposition that his wife is the building manager. They live onsite and are responsible for showing vacant apartments and maintaining the property in a safe condition by changing the locks, keeping the building clean, fixing leaks, and keeping unwanted people off the premises. Dzemil testified that the door was not broken. Dzemil testified that his wife does not believe that it is easier to keep vacant apartments unlocked. Rather, Dzemil testified that his wife is afraid of keeping the doors unlocked because she does not know who might be in the apartment.

Dzemil instructed his wife to keep the vacant units locked.

Elisa Wolter testified at her deposition that she is a property manager for WREM and acts as the liaison to the onsite property managers. The on-site managers are responsible for maintaining the building, cleaning the building, performing repairs, getting vacant apartments ready for rent, answering the telephone, showing the apartment to prospective tenants, assisting outside work, being present for city inspections, keeping unwanted persons off the property, and maintaining the property in a safe condition.

Villafana testified at his deposition that he is the plaintiff's cousin. Villafana testified that the front entrance door to the plaintiff's apartment building was locked most of the time, although he could recall a couple of times that the door was not completely closed. On November 28, 2004, Villafana observed the plaintiff walk into the apartment building. Later that evening, he received a phone call from the plaintiff in which the plaintiff said he had been attacked and needed to be driven to the hospital. Villafana drove back to the plaintiff's apartment building and observed the plaintiff sitting in the hallway with blood on him. Villafana observed an officer open the door to the second floor apartment and enter the apartment. The officer then exited the apartment and said that it was empty and that the back door was open.

Villafana also testified that he returned to the apartment building, called the telephone number listed on a "for rent" sign on the apartment building, and a middle-aged woman exited the apartment building. Villafana informed the woman that the plaintiff was in the hospital and might be late on his rent. The woman asked what had happened, and Villafana replied that someone had come out of an empty apartment and that the police had found that the doors to the apartment were open.

1-08-0248

The plaintiff filed a response to the defendants' motion for summary judgment. While plaintiff's response relied, primarily, on the depositions attached to the defendants' motion for summary judgment, he also attached to his response a letter he received in response to a Freedom of Information Act (5 ILCS 140/1 *et seq*. (West 2006)) FOIA document request; a table of 19 reported incidents from January 1, 2003, through December 31, 2004; and crime maps for the area where the property was located.

On January 9, 2008, the trial court held a hearing on the defendants' motion for summary judgment. The court found that there was no duty and no special relationship. Specifically, the trial court found no contractual basis, no reliance on a promise, no promise, no negligence, and no notice and negligent repair. Therefore, the trial court granted the defendants' motion for summary judgment.

ANALYSIS

Standard of Review

The plaintiff contends that the trial court erred when it granted the defendants' motion for summary judgment. The purpose of summary judgment is to determine whether a genuine issue of material fact exists, not to try a question of fact. Williams v. Manchester, 228 Ill. 2d 404, 417 (2008), citing Bagent v. Blessing Care Corp., 224 Ill. 2d 154, 162 (2007), and Gilbert v. Sycamore Municipal Hospital, 156 Ill. 2d 511, 517 (1993). Trial courts should grant summary judgment only where " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

- 6 -

of law.' " Williams, 228 Ill. 2d at 417, quoting 735 ILCS 5/2-1005(c) (West 2002). The trial court must strictly construe the pleadings, depositions, admissions and affidavits against the movant and liberally construe them in favor of the opponent. Williams, 228 Ill. 2d at 417. If material facts are in dispute, or if the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts, a trial issue exists and summary judgment is inappropriate. Williams, 228 Ill. 2d at 417. Summary judgment is a drastic means of disposing of litigation and should only be granted if the right of the moving party is clear and free from doubt. Williams, 228 Ill. 2d at 417, citing Adams v. Northern Illinois Gas Co., 211 Ill. 2d 32, 43 (2004). This court reviews a trial court's summary judgment ruling *de novo*. Williams, 228 Ill. 2d at 417, citing Bagent, 224 Ill. 2d at 163, and Roth v. Opiela, 211 Ill. 2d 536, 542 (2004).

Elements of a Negligence Claim

In order to state a cause of action for negligence, the plaintiff must set out sufficient facts establishing the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. Rowe v. State Bank of Lombard, 125 Ill. 2d 203, 215 (1988), citing Curtis v. County of Cook , 98 Ill. 2d 158, 162 (1983); Pelham v. Griesheimer, 92 Ill. 2d 13, 18 (1982); Cunis v. Brennan, 56 Ill. 2d 372, 374 (1974). Summary judgment in favor of the defendant is proper where the plaintiff fails to establish the existence of a duty. Rowe, 125 Ill. 2d at 215. "Whether under the facts of a case there is a relationship between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court." Rowe, 125 Ill. 2d at 215, citing Pelham, 92 Ill. 2d at 18-19; Barnes v. Washington, 56 Ill. 2d 22, 26 (1973).

Duties of a Landowner

Generally, a landowner has no duty to protect others from criminal activities by third persons. Rowe, 125 Ill. 2d at 215-16, citing Fancil v. Q.S.E. Foods, Inc., 60 Ill. 2d 552, 560 (1975); Restatement (Second) of Torts § 314 (1965); W. Keeton, Prosser & Keeton on Torts §63, at 442 (5th ed. 1984). However, a duty to protect others from criminal activities by third persons does exist where there is a special relationship between the parties. Rowe, 125 Ill. 2d at 215-16, citing Fancil, 60 Ill. 2d at 560; Restatement (Second) of Torts § 314 (1965); W. Keeton, Prosser & Keeton on Torts §63, at 442 (5th ed. 1984). Illinois courts have recognized four categories of special relationships that may give rise to a duty to protect an individual from criminal activities by third persons, including: (1) common carrier and passenger, (2) inn-keeper and guest, (3) custodian and ward, and (4) business invitor and invitee. Hills v. Bridgeview Little League Ass'n, 195 Ill. 2d 210, 243-44 (2000). However, before a duty will be imposed, the plaintiff must demonstrate that the criminal attack was reasonably foreseeable. Hills, 195 Ill. 2d at 243, citing Rowe, 125 Ill. 2d at 215-16.

The Illinois Supreme Court has repeatedly held that "the simple relationship between a landlord and tenant *** is not a 'special' one imposing a duty to protect against the criminal acts of others." Rowe, 125 Ill. 2d at 216, citing Pippin v. Chicago Housing Authority, 78 Ill. 2d 204, 208 (1979); Phillips v. Chicago Housing Authority, 89 Ill. 2d 123, 126 (1982); Martin v. Usher, 55 Ill. App. 3d 409, 410-11 (1977); Trice v. Chicago Housing Authority, 14 Ill. App. 3d 97, 99-101 (1973). However, a landlord may be responsible for the criminal acts of others if the landlord has voluntarily undertaken to provide security measures, it performs the undertaking negligently, and the negligence

is the proximate cause of injury to the plaintiff. Rowe, 125 Ill. 2d at 217. One who voluntarily provides a service must do so with reasonable care. Rowe, 125 Ill. 2d at 217.

In accord with these principles, section 324A of the Restatement (Second) of Torts, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts §324A (1965).

With regard to subsection (c) of section 324A of the Restatement (Second) of Torts, the comments provide: "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." Restatement (Second) of Torts §324A, Comment E (1965).

Voluntary Assumption of Security Measures

First, the plaintiff contends that, pursuant to subsections (a) and (c) of section 324A of the Restatement (Second) of Torts (Restatement (Second) of Torts §324A(a), (c) (1965)), WREM owed him a duty that arose from WREM's voluntary assumption of management responsibilities. We find that Halim, the president of WREM, testified at his deposition that WREM is responsible for hiring the janitors, managers, and staff of the buildings; collecting the rent; leasing the apartments; paying the bills; marketing the property to prospective tenants; and responding to the tenants' complaints. Halim further testified that the onsite managers were responsible for living in the building, showing vacant apartments to prospective tenants, collecting the rent, preparing the units for rent, performing repairs, keeping the building clean, and cutting the grass. Wolter, the liason to the on-site property managers, testified at her deposition that on-site managers are responsible for maintaining the building, cleaning the building, performing repairs, getting vacant apartments ready for rent, answering the telephone, showing the apartments to prospective tenants, assisting outside work, being present for city inspections, keeping unwanted persons off the property, and maintaining the property in a safe condition. Kaydime, the on-site property manager for the building, testified at her deposition that she is responsible for renting the apartments, cleaning the apartments before and after a tenant moves, changing the locks, showing vacant apartments to prospective tenants, responding to the tenants' complaints, checking the doors and gates, and keeping unwanted persons off the property.

After reviewing the depositions attached to the motion for summary judgment, we find that none of the deposed witnesses testified that WREM had a contract with BCH to provide building

security or agreed to be responsible for protecting the plaintiff from the criminal acts of third parties. Moreover, we further find that the plaintiff submitted no evidentiary materials (affidavits, admissions, answers to interrogatories, depositions, etc.) which established that WREM voluntarily undertook to provide security measures to BCH and its tenants or to protect BCH and its tenants, including the plaintiff, from the criminal acts of third persons. Therefore, we find that WREM did not voluntarily undertake to provide security measures to protect the plaintiff from the criminal acts of third persons. Rowe, 125 Ill. 2d at 216, citing Pippin, 78 Ill. 2d at 208; Phillips, 89 Ill. 2d at 126; Martin, 55 Ill. App. 3d at 410-11; Trice, 14 Ill. App. 3d at 99-101; Restatement (Second) of Torts §§324A(a), (c) (1965).

In addition, even if WREM had voluntarily undertaken to provide security measures, and we find that it did not, WREM was only required to exercise reasonable care. Rowe, 125 Ill. 2d at 217. We find that the plaintiff testified at his deposition that, on the night in question, he had to use his key to gain entry into the building. Birnbaums also testified at his deposition that he did not recall the front lock malfunctioning on the night in question. Thus, we find that the depositions of the plaintiff and Birnbaum establish that the front entrance of the building was locked and secured on the night in question. We further find that Birnbaums testified that he did not observe the rear gate on the night in question. Thus, we find that the plaintiff failed to present any evidentiary materials which establish that the rear lock was malfunctioning on the night in question. We further find that the plaintiff testified that the building hallway was well-lit on the night in question. Therefore, in light of the preceding, we find that the plaintiff has failed to present evidentiary materials which establish that WREM failed to exercise reasonable care when providing management services. Rowe, 125 Ill. 2d

at 217.

## Foreseeability of the Criminal Attack

Next, while a possessor of land generally owes no duty to protect tenants from criminal attacks by third party, before a duty to protect would be imposed it must be shown that the criminal attack was foreseeable. Hills, 195 Ill. 2d at 242-43, citing Rowe, 125 Ill. 2d at 215-16. We note that the plaintiff argues that the attack was foreseeable because Dzemil testified at his deposition that Kaydime kept the vacant apartments locked because she did not know who might be inside an unlocked vacant apartment. After examining the record, we find that the plaintiff failed to present any evidentiary materials which establish that a similar criminal attack had occurred in one of the apartments or that a third party had been found in one of the apartments and the previous occurrences in the apartments formed the basis for Kaydime's opinion that someone might be inside an unlocked vacant apartment. Without evidentiary materials establishing a previous criminal attack in an apartment or a previous discovery of a third person in a vacant apartment, Kaydime's opinion was nothing more than speculation or conjecture. Therefore, we find that the plaintiff failed to present evidentiary materials which establish that WREM had information in its possession that would make the criminal attack reasonably foreseeable. Hills, 195 Ill. 2d at 243, citing Rowe, 125 Ill. 2d at 215-16.

## Assumption of Duty to Protect

The plaintiff contends that WREM was negligent because it maintained a policy of keeping vacant apartments unlocked and that BCH provided WREM with a set of keys to the vacant apartments. In Rowe, the Illinois Supreme Court held that if there is an agreement to keep door locks

in repair and to furnish outside lighting, the "duty [imposed] was limited to the extent of the undertaking, *viz*, to use reasonable care in providing the necessary lighting and assuring that the locks were in working order." Rowe, 125 Ill. 2d at 218-19, citing Pippin, 78 Ill. 2d at 210. The Rowe court makes it clear that an agreement to repair locks and provide lights cannot be regarded as the assumption of a duty to protect against criminal acts. Rowe, 125 Ill. 2d at 218-19, citing Pippin, 78 Ill. 2d at 210. In N.W. v. Amalgamated Trust & Savings Bank, 196 Ill. App. 3d 1066, 1074 (1990), the court held that a promise to maintain door locks in working condition does not rise to a voluntary undertaking to protect tenants from criminal activity. N.W., 196 Ill. App. 3d at 1074, citing Rabel v. Illinois Wesleyan University, 161 Ill. App. 3d 348, 363 (1987); Carrigan v. New World Enterprises, Ltd., 112 Ill. App. 3d 970, 977-78 (1983). Therefore, we find that even if WREM promised to maintain the door locks of vacant apartments in working order and keep the vacant apartments locked, such a promise did not rise to a voluntary undertaking to protect the plaintiff from the criminal acts of third parties. Rowe, 128 Ill. 2d at 218-19; N.W., 196 Ill. App. 3d at 1074, citing Rabel, 161 Ill. App. 3d at 363; Carrigan, 112 Ill. App. 3d at 977-78.

Duty of Ordinary Care

Next, the plaintiff contends that the trial court erred in granting the defendants' motion for summary judgment because a genuine issue of material fact existed as to whether BCH, the owner, breached its duty of ordinary care with regard to the common areas and vacant apartments over which it retained possession and control. In support of its argument, the plaintiff relies on Rowe, in which the Illinois Supreme Court recognized that it is "axiomatic that if a landlord retains control of a portion of the premises leased to the tenant it has the duty, as the party in control, to use ordinary

care in maintaining that part of the premises in a reasonably safe condition." Rowe, 125 Ill. 2d at 220, citing Drewick v. Interstate Terminals, Inc., 42 Ill. 2d 345 (1969), Murphy v. Illinois State Trust Co., 375 Ill. 310 (1940). We find the facts in Rowe distinguishable from the facts in the instant case. In Rowe, the property manager retained access, through master keys, to the individual office units where the plaintiff and the decedent were attacked. The Rowe court found that, under the circumstances, the crimes were within the scope of foreseeable risk created by the inadequate control of the master and grandmaster keys. Rowe, 125 Ill. 2d at 227. The Rowe court held that a genuine issue of material fact existed as to whether the danger of criminal conduct by individuals possessing passkeys was sufficiently probable and predictable to create a duty upon the defendants to take reasonable precautionary measures and whether the failure to do so was the proximate cause of the plaintiff's damages. Rowe, 125 Ill. 2d at 228.

In the instant case, the plaintiff does not allege in his complaint and there are no evidentiary materials which establish that BCH, WREM, or WREM's on-site managers failed to maintain control of the building's master keys or any other instrumentality that was critical to security in the apartment building. Rather, the evidence established that the front door was locked on the night in question, and the plaintiff failed to present evidentiary materials which establish that the rear door was unlocked on the night in question. Accordingly, the plaintiff failed to present evidentiary materials which establish acts that BCH breached its duty of ordinary care.

We also find the facts in Shea v. Preservation Chicago, Inc., 206 Ill. App. 3d 657 (1990), upon which the plaintiff relies, distinguishable from the facts in the instant case. In Shea, the defendants' landlord and leasing agent represented to the plaintiff that the defendants would repair

and maintain an existing defective and inoperable interior security door and safety lock. The Shea court found that a reasonable person in the landlord's position would have been aware of the risk of unauthorized entry and the resulting criminal attacks by third persons posed by an inoperable interior safety door and safety lock. The Shea court held the landlord was in the best position to guard against the risks arising from the disrepair of the internal security door and safety lock. Shea, 206 Ill. App. 3d at 664. In the instant case, the evidence established that the front door was locked and the plaintiff presented no evidentiary materials which established that the back door was unlocked on the night in question. Therefore, we find that Shea fails to provide support for the plaintiff's position that genuine issues of material fact exists as to whether BCH breached its duty of ordinary care with regard to the common areas and vacant apartments over which it retained possession and control.

CONCLUSION

In this case, there were no evidentiary materials in the record which established that the owner or management company voluntarily undertook to provide security measures for the apartment complex. In addition, there were no evidentiary materials in the record which established that the front door was unlocked or that the back gate was unlocked. There were also no evidentiary materials in the record which established that there had been a previous criminal attack that would have made it foreseeable that a criminal attack might occur if the front door or rear door were unlocked. We also found no evidentiary materials which established that BCH breached its duty of ordinary care with regard to the common areas and vacant apartments over which it retained possession and control. Here, we find no material issues of fact in dispute and we find that the defendants were entitled to a judgment as a matter of law. Accordingly, the trial court did not err

when it granted the defendants' motion for summary judgment.

Affirmed.

O'MARA FROSSARD, P.J., and O'BRIEN, J., concur.