# Illinois Official Reports

## Appellate Court

---

*McKenna v. AlliedBarton Security Services, LLC*, 2015 IL App (1st) 133414

---

| | |
|---|---|
| . Appellate Court Caption | SUZANNE E. MALEC McKENNA, as Executor and Personal Representative of the Estate of Michael R. Malec McKenna, Deceased; Louise E. Hoover, as Executor of the Estate of Allen J. Hoover, Deceased; TEIJI ABE, as Executor of the Estate of Paul Goodson, Deceased; and RUTH ZAK LEIB, Plaintiffs-Appellants, v. ALLIEDBARTON SECURITY SERVICES, LLC, a/k/a AlliedBarton Security Services; UST-GEPT, a Joint Venture; GE ASSET MANAGEMENT, INC; NACA MADISON, LLC; MB REAL ESTATE SERVICES, LLC; ROBERT BROWN, Individually and as Agent of AlliedBarton Security Services, LLC, a/k/a AlliedBarton Security Services and as of Agent of UST-GEPT; GE Asset Management, Inc.; NACA Madison, LLC; and MB Real Estate Services, LLC; SIDNEY CHAMBERS, Individually and as Agent of AlliedBarton Security Services, LLC, a/k/a AlliedBarton Security Services and as of Agent of UST-GEPT; GE Asset Management, Inc.; NACA Madison, LLC; and MB Real Estate Services, LLC; GREGORY J. JENKINS SR., Individually and as of Agent of UST-GEPT; GE Asset Management, Inc.; NACA Madison, LLC; and MB Real Estate Services, LLC, Defendants-Appellees (Susan Gitelson, Special Administrator of the Estate of Joseph Jackson, Deceased, Defendant). |
| District & No. | First District, Third Division<br>Docket Nos. 1-13-3414, 1-13-3415, 1-13-3416, 1-13-3417 cons. |
| Filed | June 17, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-13619; the Hon. Kathy M. Flanagan, Judge, presiding. |

| Judgment | Reversed and remanded. |
|---|---|
| Counsel on Appeal | Joseph A. Power, Jr., Larry R. Rogers, Devon C. Bruce, and Brian LaCien, all of Power, Rogers & Smith, P.C., of Chicago, for appellants. |
| | Robert M. Burke, David M. Macksey, Garrett L. Boehm, Jr., and Brian P. Gainer, all of Johnson & Bell, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Hyman and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1   On December 8, 2006, four tenants of the Citigroup Center/Ogilvie Transportation Center were shot (three fatally) by an interloper who was initially denied access to the office tower portion of the building by security personnel. This individual persisted in his effort to get up to a private office in the building and was taken there by a security guard after telling him he was holding a gun inside a large, manila envelope in his hand. Thus, despite various security measures that were in place to protect the tenants of this office building, an armed killer was brought to an office on the thirty-eighth floor, where he went on a shooting rampage that claimed three lives while injuring another person. After exhaustive discovery and extensive motion practice, defendants [1] AlliedBarton Security Services, LLC (AB), and NACA Madison, LLC (NACA), successfully obtained summary judgment in the trial court, after convincing the motion judge that they owed no duty to protect these plaintiffs and that their conduct could not, as a matter of law, be considered a proximate cause of the injuries and deaths. We disagree on both bases and reverse and remand to the trial court for further proceedings.

¶ 2                                    BACKGROUND

¶ 3   The complex at 500 West Madison Street in Chicago is a multi-use development, consisting of a Metra train station, a three-level commercial space for the general public and a private office tower for floors 4 through 40. Its elevator lobby was accessible only on the third floor after one was screened. The screening was principally achieved by a concierge desk, where identification from a potential visitor was required to be shown and concomitant authorization was required from the involved tenant. Tenants and those in their employ were

---

[1]Although plaintiffs filed this action against numerous defendants only two defendants are at issue in this appeal, AlliedBarton Security Services, LLC, and NACA Madison, LLC. Accordingly, "defendants" as used in this opinion refers to those two parties.

provided preapproved keycards to get through the electronic turnstiles. The very public nature of the adjacent train station and public dining and shopping space as contrasted with the office tower with private and governmental agency offices created various challenges for the owners and managers of the building, which, acting in a responsible fashion, contracted with an established security contractor to work jointly to ensure the safety of those lawfully using the premises for whatever reasons.

¶ 4    Joseph Jackson entered the building in the late morning hours and was observed loitering in different areas of the building on a couple occasions by AB security guard Sidney Chambers. In mid-afternoon, he attempted to gain access to the thirty-eighth floor to "visit" Michael McKenna, an attorney who rented space in the Wood, Phillips office on that floor. It was subsequently learned that Jackson was convinced that McKenna had "stolen" his idea to secure a patent for a truck "port-a-potty." Earlier that morning, he had left notes at his home indicating his mental distress, implying that he would not be around at day's end.

¶ 5    Given that he did not have an appointment and would not provide identification, Jackson was rebuffed by concierge personnel at the third-floor reception desk when he attempted to get a temporary keycard to access the elevators. He was directed to the down escalator, instead of being taken out of the building. He later reappeared at the third-floor area. Jackson showed Brown a large manila envelope in his hands and told him there was a gun inside it. Brown, who was uniformed but unarmed, did not observe a weapon at that time. Jackson demanded that Brown take him to the thirty-eighth floor. This exchange was seen, but not heard, at a distance by Brown's supervisor, the aforementioned Sidney Chambers, who was then concerned that there might be trouble, so he approached the pair. As he got closer, Jackson whispered to Brown to "get rid of him [Chambers]." In response to Chambers' inquiry, Brown indicated that there was no problem and Chambers left to go to the control room. Even though Chambers felt Jackson was acting suspiciously, he neither continued to watch the two men nor, as we discuss in more detail below, did he take any number of available precautions to prevent Jackson from gaining access to the office tower. Brown then proceeded to swipe his own pass twice on an electronic turnstile to get himself and Jackson onto the elevator and then to the thirty-eighth floor. Once on the elevator, Jackson told Brown, "[d]on't be a hero" and that he wanted Brown to see his family later that night. Jackson also told Brown that there was a guy "up there" who owed him some money.

¶ 6    The following events were observed at various times and testified to by Brown, an office receptionist, and McKenna's assistant, plaintiff Ruth Lieb. While their testimony is not entirely consistent, it can be fairly summarized, in pertinent part, as follows. When Brown and Jackson arrived at the Wood, Phillips law office, they were buzzed in by the office receptionist, Starla Hargita, who saw the uniformed guard at the door. Once inside, Jackson demanded to see McKenna, but was told that he was in a meeting. Hargita motioned to Lieb, who was in a nearby conference room (apparently visible through glass partition walls) with McKenna and a client, Morris Danzig. Soon thereafter, Lieb appeared at the reception desk and, as Jackson pulled out the gun, Brown exclaimed, "Why is this happening on my watch?" Presumably seeking to diffuse the situation, Brown then asked if Jackson could just "leave a message." Jackson responded, "Yeah, I'm gonna to [*sic*] leave a message," pulled an envelope or a bag out of his jacket which contained a gun and a chain which he used to chain the office door shut. Lieb saw that Jackson also had a hammer that he took out of what she described as a "gym bag." She was not entirely sure if the gun came from the bag or from his pocket, but he then

pointed it at Lieb's head and told her to "go get McKenna" or she would be killed. She complied. As she walked, hand in hand with McKenna back toward the reception area, she whispered that the man out in the reception area was armed and that McKenna should be careful.

¶ 7        McKenna was soon at the reception area where Jackson told McKenna that he owed him money. After a brief conversation in which McKenna asked how he could "help" him, Jackson pointed his gun at McKenna and shot him, fatally, in the head. The receptionist hid under her desk with another employee. Lieb ran into the office and ducked under a desk. Jackson found her and again pointed a gun to her head. She pleaded for her life, telling the shooter that she had babies at home. She said he seemed puzzled, as if she were too old to have babies, and asked her if she really had babies. She responded affirmatively. He seemed to momentarily process that information and then moved the gun from her head, shooting her instead in the foot.

¶ 8        Jackson walked further into the office where he shot and killed Allen Hoover. He then took Paul Goodson hostage and walked to the firm's lobby, where they were confronted by Chicago police department (CPD) officers who had been called to the scene. He was told to drop his weapon, but he quickly moved out of the officers' view and killed Goodson. Jackson then grabbed the 81-year-old Danzig and used him as a human shield. At some point, Jackson opened fire on the officers, who returned fire. Jackson then knelt on the ground with Danzig in front of him and alternately pointed the gun at his own head and at Danzig's. This prompted a CPD "SWAT" officer to shoot Jackson, with the bullet "whizzing" by the war veteran Danzig's head. Another officer then shot Jackson in the chest and he died. Danzig was unharmed.

¶ 9        The one surviving victim and the estates of the three victims who were killed filed wrongful death and survival action complaints against AB and NACA, the owners and/or the management company of the building. NACA was sued individually and as an agent of AB, which was sued for the alleged negligence of its security operation, both in its scope and in its allegedly negligent execution on and before the date of the incident. Discovery before the motions for summary judgment revealed the following information about the security-related activities of defendants.

¶ 10        NACA hired AB to provide security at the 500 West Madison building. The parties entered into a contract the stated goal of which was to "insure the safety of all persons and property" on the premises, which also specifically included the "safety and protection of life." There were multitudinous aspects to the provision of security, but the focus of this lawsuit, understandably, pertained to the ways in which a member of the public could possibly gain access to the office tower of the building, which was to be accessed only by tenants, employees and their specifically invited guests. Generally speaking, this was employed by a combination of security personnel at or near the entrance to the elevator bays on the third floor, a keycard system for access by tenants, employees and security staffers, elevator technology and cameras along with the retaining of security consultants to evaluate security risks and performance. The daily presence of as many as 100,000 commuters and visitors, including some 3,000 who worked in the office tower itself, obviously created multiple levels of security needs.

¶ 11        As mentioned above, employees who worked in the office tower were given keycards that provided easy entry through turnstiles (not gated during normal business hours) into the elevator lobby on the third floor, which then provided access via elevators for floors 4 through 40. Members of the public who had appointments in any of the many offices could gain access

at a reception desk where receptionist personnel would check to see if a given individual had an appointment with a tenant and where that individual's identification would be checked before provision of a temporary keycard. At the time of this occurrence, there was but one security officer assigned to this area, with another assigned as a floater who covered all three floors beneath the tower.

¶ 12 There was some testimony about use of "safe words" or duress codes that might be used in emergency circumstances. Chambers testified that he complained about the lack of such a system to his supervisor. He also testified that he had informed NACA security director Greg Jenkins about various concerns, including the fact that the staffing of the third-floor area had been cut in half during much of the time the building was open. As to the date of the shooting, Chambers testified that he had observed Jackson on several occasions. At first, it appeared that Jackson was lost on the first floor. He then saw Jackson several hours later and he appeared to be looking around on the first floor. The third time Chambers saw Jackson was on the third-floor when Brown directed him to a receptionist after he said he was headed to the thirty-eighth floor. Surveillance video shows Jackson being asked for his identification, then laying a large manila envelope flat on the counter and pulling out his wallet but then leaving the area. Chambers then witnessed a brief interaction between Jackson and Brown at the reception desk, which meant Jackson was not authorized to be in the building. Brown then permitted Jackson to go down the escalator to exit the building but did not otherwise interact with him in any meaningful way from a security standpoint.

¶ 13 The final time Chambers saw Jackson came about 15 minutes after he was turned away from the receptionist desk. This time, he observed Jackson alongside Brown. He felt Jackson was "suspicious" based on the previous observations and because he had both of his hands in his pockets. He approached the two in an effort to make sure everything was okay. Brown verbally reassured him and Chambers left the area. In terms of the adequacy of the security operation, Chambers said that he was unaware of any security breach as of the last time he saw Jackson and Brown together, but added that if there had been a code or alarm system in place, he and Brown could have physically restrained Jackson and removed him from the area.

¶ 14 In addition to relating the horrific events in the Wood, Phillips offices as outlined above, Brown testified that he violated protocol by leaving his post at the concierge station and allowing Jackson entrance to the elevator with a weapon. He also violated protocol by swiping his keycard twice, which first allowed both of them through. He also indicated that had he only swiped it for himself, an alarm would have sounded as the second man went through. He agreed that allowing Jackson onto the elevator was also a breach in "protocols and posts."

¶ 15 NACA's director of security, Jenkins, was on call 24 hours a day according to his testimony. Among other things, he supervised the access control system including the keycards and turnstiles. The contract between NACA and AB provided that NACA controlled the hiring and discipline of all AB security officers. The contract also specifically provided that AB was to "assist" Jenkins in implementing protocols and any recommendations of security consultants. Among other provisions, the protocols included information about the danger of workplace incidents leading to murder and that hostile situations needed to be defused to minimize danger. The protocols also indicated that hostile individuals were to be kept out of interior spaces, that 911 should be called in emergencies, and that emergency or duress codes should be used over the radio. Armed METRA officers worked in the building and were available, if called, to deal with any armed individuals. Security officers were permitted to

restrain individuals if they posed a danger but did not show a weapon. Officers were also permitted to check bags to ensure that there were no weapons being brought into the building. Finally, the protocols referred to the danger posed by violent individuals who were "probably armed" while instructing officers to signal others for help, warn others, stall for time and attempt to prevent such individuals from moving out of an area and hurting others.

¶ 16  Discovery also revealed some information about two separate consultations performed by Kroll Security and Baker-Eubanks several years before NACA hired AB. Notably, at least one of the consultants warned that there was an "obvious breach in the security system" in the observed ability for interlopers to avoid security and get to the office tower floors. This was listed as a "*bona fide* and immediate threat." The report recommended challenging suspicious people and encouraged development of countermeasures to prevent workplace violence. It also should be noted that AB was not given either report, a fact that the parties viewed differently according to their individual perspectives in the lawsuit.

¶ 17  Plaintiffs retained two security experts who gave discovery depositions. Succinctly stated, these experts opined that various deficiencies (enumerated as more than a dozen) by NACA and AB represented negligence on their respective parts and that these deficiencies caused or contributed to the injuries and deaths. Principally, they were faulted for not having a system by which a security officer could have used a code word or used a form of alarm without tipping off a potential protagonist in an emergency situation. The individual officers were also deemed negligent by these experts for their combined failure to restrain and disarm Jackson and for bringing him up to the Wood, Phillips offices while armed. Plaintiffs also note that defendants' security expert testified that he himself would have restrained Jackson once his intentions were made clear.

¶ 18  Procedurally speaking, this case was pending for almost six years before its ultimate disposition. The motion judge initially assigned to the case denied defendants' motions to dismiss that argued they owed no duty to protect the victims and that there was no proof of proximate cause connecting their actions or inactions to the injuries and deaths. The case was later reassigned to another motion judge. Just three weeks later, defendants brought motions for summary judgment making nearly identical arguments before the new motion judge, who granted the motions, leading to this timely appeal.

¶ 19                    MOTIONS FOR SUMMARY JUDGMENT

¶ 20  Although each defendant brought its own motion for summary judgment that endeavored in part to distinguish its individual conduct from its codefendants', the legal theories were, in the main, quite similar. Both defendants argued that there was no duty owed by them to any of the victims, that Jackson's murderous rampage was unforeseeable as a matter of law and that their conduct could not legally amount to a proximate cause of the injuries and deaths. In addition, NACA argued that it could not be held liable for any acts or omissions of AB, as there was no agency relationship between the two, notwithstanding the contract between them. We review the entry of summary judgment on a *de novo* basis, giving no deference to the trial court. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009). Summary judgment is considered a drastic remedy and should only be granted when the pleadings, depositions, and affidavits on file demonstrate that there is no genuine issue as to any material fact as a matter of law. While plaintiff certainly bears a burden on summary judgment to provide real issues of fact, she is not required to prove her case on summary judgment, and

only needs to present facts that arguably entitle her to proceed to a trial on the merits. *Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813, 816 (1981).

¶ 21                        NACA's Motion for Summary Judgment

¶ 22    To recover in a negligence action, plaintiff must prove sufficient facts to establish a duty on the part of the defendant, a breach thereof and that plaintiff's damages were proximately caused by that breach. *Dunning v. Dynegy Midwest Generation, Inc.*, 2015 IL App (5th) 140168, ¶ 63. Duty is a question of law. *Peters v. Riggs*, 2015 IL App (4th) 140043, ¶ 44. To determine whether a defendant owes a duty of care to protect a potential plaintiff, the court analyzes several criteria, including the foreseeability of harm. *Bear v. Power Air, Inc.*, 230 Ill. App. 3d 403, 408 (1992). In a premises liability case such as this, there is generally no duty on the part of a landowner to protect against the criminal acts of a third party, like the gunman in this case. *Iseberg v. Gross*, 227 Ill. 2d 78, 87 (2007). The law does, however, recognize certain "special relationships" that could trigger such a duty. *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 47 (1991). There are four legally recognized special relationships in Illinois, which stem from the Restatement (Second) of Torts § 315(a) (1965). The victims here were all employees of tenants of the building, but Illinois does not recognize landlord/tenant as a special relationship that would trigger such a duty to protect against criminal activity. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 24.

¶ 23    Notwithstanding the above precedent, a defendant may be liable for the criminal actions of third parties if it voluntarily undertakes to protect against such activity by providing security measures. *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 209-10 (1979). If a defendant is deemed to have voluntarily undertaken a duty to protect people (tenants), the related question of foreseeability is subsumed within that undertaking. *Berg v. Allied Security, Inc., Chicago*, 297 Ill. App. 3d 891 (1998), *vac'd on other grounds sub nom. Berg v. Allied Security, Inc.*, 193 Ill. 2d 186 (2000). This is only logical, as it would strain credulity to allow a defendant to voluntarily undertake a duty to protect the life of his tenants while avoiding liability by arguing that harm to them would be unforeseeable. Proximate cause, as we will discuss below, is a discrete proposition.

¶ 24    The NACA defendants, comprised of the owners and managers of the building, argued below that they were entitled to summary judgment, *inter alia*, because they had contracted away the security of the building to AB and therefore could only be liable under a theory of negligent hiring because their only voluntary undertaking in this regard was to hire a competent professional. *Sameer v. Butt*, 343 Ill. App. 3d 78, 90 (2003). This argument, however, basically assumes that the contract provided that NACA would remain uninvolved in the design and implementation of the security system at the building once it hired a competent contractor. That, however, would be a manifestly faulty assumption. In the contract between the parties, NACA specifically reserved the right to "concurrently provide services of the same type" as AB while also remaining the party that would supply "policies and procedures" regarding security measures which included the use of "reasonable effort to deter persons observed attempting to gain or gaining unauthorized access to the Property." NACA had its own director of security who oversaw AB's activities. In fact, the continuing participation of NACA was contractually prescribed as AB agreed to "[a]ssist Director of Security in developing, implementing, and updating security manual and post orders, utilizing the recommendations made by the Property's security consultant."

- 7 -

¶ 25    Plaintiff properly suggests that this provision is connected to the reports that NACA commissioned from Kroll and Baker-Eubanks that were the subject of a great deal of discovery and which were considered as part of the facts presented at summary judgment. These reports, commissioned after the 9/11 tragedies, involved a thorough review of the security systems at the building. Plaintiffs argue strenuously that the fact that AB never received these reports presents a significant question of material fact as to NACA's negligence. AB was never directly given information about the consultants' warning regarding the observed danger of interlopers gaining access to the office towers from the third-floor concierge area, a subject discussed in at least one of those consultant reports. In its ruling, the trial court failed to take proper account of the application of these contractual provisions and as such, failed to recognize the presence of material issues of fact regarding the potential liability of NACA. These questions of fact should be resolved by a fact finder at trial, not at the summary judgment stage. See *Winger v. Franciscan Medical Center*, 299 Ill. App. 3d 364, 375 (1998).

¶ 26    The parties have cited various cases regarding the voluntary provision of security by a landowner and many have some factual and legal similarities. In our judgment, this case is most similar to *Berg v. Allied Security, Inc., Chicago*, 297 Ill. App. 3d 891 (1998), *vacated on other grounds sub nom. Berg v. Allied Security, Inc.*, 193 Ill. 2d 186 (2000). While we appreciate that *Berg* has been vacated on other grounds, reviewing courts have since found it persuasive and we do as well. In *Berg*, plaintiff was assaulted by a man with a metal rod as she returned to her place of employment carrying pizzas for her co-workers. The building in which she worked was managed by a company ("landlord") which had a contract with a security company. In that contract, the parties "jointly decided upon the security activities to be performed," which included reducing the risk of " 'assault.' " (Emphasis omitted.) *Berg*, 297 Ill. App. 3d at 900. This court, in reversing the trial court's order of summary judgment in favor of both defendants, acknowledged the general rule that a landowner does not owe a duty to protect against the criminal acts of third parties, but noted that a duty will be imposed where there is a voluntary undertaking of supplying security services and there is negligence involved. *Id.* at 901. The court found that both defendants voluntarily assumed a duty to protect plaintiff "from the criminal acts of third parties on the premises." *Id.*

¶ 27    The *Berg* court noted that the landlord had exclusive control over the installation and maintenance of the security system and that it retained the defendant security agency pursuant to a contract in which the landlord "undertook to perform the guard services in concert with [the contractor]." *Id.* at 902. The court concluded that there were genuine issues of material fact as to whether the landlord was negligent in the hiring of the contractor or in its overseeing of that contractor. *Id.* This is precisely the situation in this case. NACA, by its contract and through its director of security, both approved and oversaw the activities of its security contractor and therefore is legally held to have undertaken a duty to protect the tenants in the office tower of this multi-use building. The NACA defendants' suggestion at oral argument that they should avoid liability because there was no proof that they actually followed through on these contractually imposed duties is at once cynical and unavailing. Having found issues of material fact in this specific regard, we need not consider the other factual matters raised by plaintiffs in the court below or before us, but suffice it to say that there are many factual issues about NACA's potential negligence that remain to be decided by a fact finder.

¶ 28                 AlliedBarton's Motion for Summary Judgment

¶ 29      AB argues that the trial court properly granted its summary judgment motion, averring that it and its unarmed security guards did not have a "duty to protect anyone from the criminal acts of a third party and that [AB] did not voluntarily take on any such duty." Its overarching argument is that the trial court's entry of summary judgment was proper because it only had the duty to take "reasonable" steps to prevent criminal activity on the premises, while resolutely claiming that there is no evidence that the conduct of its employees was in any way unreasonable. AB suggests that NACA "controlled the building security program, including deciding how many guards were needed *** [and] whether security guards would be allowed to carry weapons." It further argues that when its guard was confronted "by an armed madman," he properly did not attempt to "confront or disarm" him, adding that it would be "speculation to conclude" that its guard's failure to attempt to disarm the gunman or his failure to use a code word when his colleague asked him if there was any problem with the gunman, caused, or contributed to cause the injuries and deaths that came later. AB argues that the trial court correctly found that "the evidence in the record does not provide a causal nexus between [any negligent failure to follow regulations] and the shooting."

¶ 30      In response, plaintiff argues that AB's contract with NACA created a specific duty on its part to protect persons and property at the building. As noted, the contract between NACA and AB specifically provided that the overarching goal was to "protect life and insure the safety of all persons." While it might be overstatement to suggest that this isolated provision imposed a duty, analysis of the entire contract makes it clear that AB voluntarily assumed a duty to protect the tenants of the office tower from the foreseeable violence of interlopers like the murderous Jackson, a mentally unhinged and aggrieved client of a building tenant. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 227 (1988). As it did in the trial court, AB relies heavily on *Aidroos v. Vance Uniformed Protection Services, Inc.*, 386 Ill. App. 3d 167 (2008). The trial court, in fact, also relied upon *Aidroos* to grant summary judgment. In our judgment, that reliance is demonstrably misplaced. In *Aidroos*, a disgruntled former employee shot multiple people at his former workplace after putting a gun to the head of an unarmed security officer who then walked with the offender into the plant, through a door that was supposed to be locked. Once inside, the gunman randomly shot workers, killing four and injuring others, before taking his own life.

¶ 31      As stated, there are some factual similarities in that the event involved an armed interloper and an unarmed security guard, but the most significant legal dissimilarity concerns the question of duty, stemming from the contractual agreement that defendant had with Navistar, the owner of the facility where the mayhem took place. In that agreement, it was specifically noted that defendant, the security firm, did not " 'insure or guarantee the personal safety of any person or the security of any property' " and that it would not " 'have any liability arising from the criminal acts of any third parties.' " *Id.* at 169. The defendant in *Aidroos* also "did not design, install or maintain the keycard system," for which Navistar was responsible. *Id.* at 170. The main duties of the security officers were designed to "protect and prevent loss from fire, theft, sabotage, vandalism, or horseplay." *Id.*

¶ 32      In affirming the trial court's grant of summary judgment, the *Aidroos* court went out of its way to note that the involved contract "stated that Vance did not guarantee the personal safety of any person and had no liability arising from the criminal acts of third parties." *Id.* at 174. Contrarily, in this case the contract between the defendants recognized that workplace violence

could lead to murder and the security personnel were supposedly trained in how to defuse potentially violent situations, though no evidence of effective training was revealed in this tragic case. The protocol and post orders here specifically addressed how to deal with individuals who might be armed. In *Aidroos*, the court noted that there was no evidence to support the assertion that defendant was relied on " 'to secure the facility and exclude feared intruders.' " *Id.* at 175. Thus, our analysis of *Aidroos* reveals that it is wholly inapposite to the facts, circumstances, and pertinent legal reasoning of this case and does not support the trial court's entry of summary judgment.

¶ 33        Here, AB specifically undertook a duty to protect life in its contract. Plaintiff's allegations that it did so negligently are supported by the underlying facts in that Brown violated post orders. These violations included using his keycard to allow an unauthorized person into the office tower elevator which he used to later enter an office. Chambers likewise made no efforts to prevent Jackson, who he believed to be acting suspiciously, from accessing the tenant floors. Such reasonable efforts could have included watching Brown and Jackson, which would have revealed the double swipe of the keycard at the turnstile. He could have then called armed METRA officers and Chicago Police, who were already in the building. He also had the option of temporarily shutting down or recalling elevators until Jackson's whereabouts were ascertained. Chambers could have alerted all tenants to immediately lock their doors and deny entry to any person pending further notice. Instead, Chambers did absolutely nothing, except leave the lobby area and go to the control room.

¶ 34        Plaintiffs' allegations of negligence are also supported by the failure to establish a system of code words to alert other employees of a possible danger. They are supported by the expert opinions supplied by plaintiff that criticized defendant for the actions and inactions of its employees and for the faulty security system it employed. Despite defendants' urgent arguments to the contrary, which seem to equate these guards to hotel doormen, the fact that the security guards were unarmed does not obviate their negligence or the negligence of their employer. These men were assigned to be security officers and all of the tenants in the building, including these four victims, relied upon the professional discharge of their duties. These are all material issues of fact that should be resolved by a jury, not by a judge on summary judgment. See *Claudy v. City of Sycamore*, 170 Ill. App. 3d 990, 998 (1998).

¶ 35                                              Proximate Cause

¶ 36        Both defendants argue that even if this court were to find that they owed a duty of care and that material issues of fact regarding their negligence may be found, they must still be granted summary judgment because none of their actions or inactions constitute a proximate cause of the deaths of the three victims and the injuries to the fourth. *Sanchez v. Wilmette Real Estate & Management Co.*, 404 Ill. App. 3d 54, 59 (2010); *Sameer*, 343 Ill. App. 3d at 90. We disagree. The threat of workplace violence has long been an unfortunate facet of American life. The owner/manager of this high-volume pedestrian traffic building and its security firm not only foresaw the possibility of it occurring, they went to some considerable lengths in an effort to prevent violence. One can easily understand why they would do so, because it would probably be difficult to find tenants who were uninterested in adequate security in this day and age. That there may have been faults in their security system is a fact question, as is the question of whether their actions or inactions, in natural or probable sequence, constituted a substantial factor in bringing about these deaths and injuries.

¶ 37    The term "proximate cause" describes two requirements, cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). Cause in fact can be established if a defendant's conduct can be deemed to be a substantial factor in bringing about the injury. *Id.* If reasonable minds could differ on whether the conduct was a substantial factor, the question is "for the jury to decide." *Id.* In this case, these two defendants contracted to work in concert to devise a security scheme to protect the lives of tenants and visitors in the building. Plaintiffs have presented numerous deficiencies in the delivery of security that could well be dubbed substantial factors in allowing the armed interloper to carry out his murderous campaign on the thirty-eighth floor. These include the failure to remove Jackson from the building before he claimed to have a gun, the failure to attempt to disarm him before he produced the gun, and the act of using a guard's keycard to bring Jackson to the thirty-eighth floor where his murderous plans came to fruition. Thus, plaintiff has met the substantial factor test.

¶ 38    Legal cause is essentially a question of foreseeability, where one determines whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* at 456. Both defendants foresaw that they could potentially be dealing with armed individuals who could wreak workplace violence on the premises, so the foreseeability prong of proximate cause is undeniably present under these facts, if only because these defendants attempted to lessen the possibility of such violence occurring. We choose to ignore defendants' repeated suggestions that they can escape liability by claiming what they foresaw and sought to prevent can somehow be dubbed legally unforeseeable.

¶ 39    Defendants persuaded the trial court to rule that proximate cause could not be established as a matter of law, entitling them to the grant of summary of judgment, but it is axiomatic that proximate cause is ordinarily a question of fact to be decided by the jury. In our judgment, the trial court erred in deciding that proximate cause could not be established as a matter of law. See *Prodromos v. Everen Securities, Inc.*, 341 Ill. App. 3d 718, 728 (2003) (reviewing court reversed the trial court's granting of summary judgment because there were questions of fact regarding proximate cause).

¶ 40    In *Berg*, this court first determined that there was no need to engage in a foreseeability analysis (as it relates to the question of duty) since a voluntary undertaking had occurred, but it also went on to note that the question of whether proximate cause could be proved was one where there were "factual matters for a jury to decide." *Berg*, 297 Ill. App. 3d at 905. In closing, the court noted that "plaintiff still must pass the hurdle of proving that her crime could have been prevented. Nevertheless, she should be allowed to try." *Id.* The same is certainly true here, as there are issues of material fact on whether these crimes were materially enabled by defendants' negligence that ought to be decided by a jury, not a judge on summary judgment. Similarly, this court, in addressing causation in an assault and robbery in a women's "residence club," held that the issue was properly put to a jury where there was evidence of several prior attempted break-ins at the club when combined with the "general character" of the surrounding neighborhood, which included several taverns and an adjacent rooming house. *Mrzlak v. Ettinger*, 25 Ill. App. 3d 706, 711 (1975).

¶ 41    The question of proximate cause was discussed in another landlord/tenant case involving faulty security where a former employee shot two women, killing one. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203 (1988). In *Rowe*, two women worked in a building within an office park that was managed by a company that had an on-site managing agent who had been alerted on several occasions of burglaries at the office park where there was no sign of forced entry.

There was a proposal to change all of the locks but management deferred, based on the fact that it would cost more than $2,000. A man named Free had worked at the office park and was seen often in the possession of master keys that would open all of the locks.

¶ 42 After one of the women was killed and the other injured by Free, a lawsuit was brought against various defendants, including the managing agent and his employer, Paramount. Plaintiffs attempted to persuade the court to impose a duty on the landlord to protect tenants against criminal activity, but the court declined, citing numerous cases where it had earlier declined to do so. *Id.* at 216-17. The court also pointed out that although the relevant lease specifically provided that the landlord maintained exclusive control over the installation of security devices, it would not use that provision to impose a duty because the lease did not in any way prevent the lessee from installing security devices; it merely required the lessee to obtain the lessor's permission. *Id.* at 221.

¶ 43 The court, however, agreed with plaintiff's argument that, by "retaining access to the individual office units and manufacturing master and grandmaster keys to facilitate entry," the landlord assumed a duty to take "reasonable precautions to prevent unauthorized entries by individuals possessing those keys." *Id.* (citing *Kendall v. Gore Properties, Inc.*, 236 F.2d 673, 678 (D.C. Cir. 1956), and *Smith v. General Apartment Co.*, 213 S.E.2d 74 (Ga. Ct. App. 1975)). Since there were master and grandmaster keys unaccounted for, a risk was created by the landlord that one in possession of the keys, such as Free, might make "unlawful use" of them. Reversing the trial court's entry of summary judgment in favor of the landlord and its managing agent, the court held, "[t]here is evidence in the record here that raises a genuine issue of material fact as to whether proper control was maintained over the distribution of master and grandmaster keys, and as a proximate result, Free obtained a key which he used to enter the offices where he attacked Rowe and Sepico." *Id.* at 222.

¶ 44 Like the defendants in the case *sub judice*, the defendants in *Rowe* contended that the acts of the killer were an independent intervening cause that "operated to insulate them from liability." *Id.* at 224. In dismissing this argument, the court noted that "where the defendant's acts or omissions create a condition conducive to a foreseeable intervening criminal act," that defense would not be availing. *Id.* In further debunking this defense, the court noted that defendants could be held liable even where there was no evidence of previous violent crime on the premises, because the risk created by their negligence (access by someone in possession of master keys) would not negate the "unforeseeablility of what exactly could develop and the extent of the injury or loss will not limit liability." *Id.* at 227. As applied here, then, it is not a defense that one could not exactly foresee what a disturbed individual like Jackson might be capable of, provided that he was able to accomplish his criminal deeds as a result of the risk created by defendants' allegedly faulty security system. There is no shortage of evidence that defendants' conduct increased the risk to tenants in this case. Or, as another court aptly commented, "intervening causes which lie within the scope of the foreseeable risk *** are not superseding causes which relieve the initial tortfeasor from liability." *Morris v. Farley Enterprises, Inc.,* 661 P.2d 167, 170 (Alaska 1983).

¶ 45 In the seminal Illinois case on intervening causes, our supreme court held:

"The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from

- 12 -

his act. \*\*\* The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was, itself, probable or foreseeable." (Internal quotation marks omitted.) *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 79 (1954).

¶ 46   In *Ney*, the court held that proof of causation was adequate where a cab driver left the keys in his cab, enabling a thief to steal the cab and later get in a crash. The fact that the cab company could not specifically predict that the thief might drive recklessly did not insulate it from liability. Similarly, these plaintiffs are not required to precisely establish the foreseeability that someone like Jackson, aggrieved with a tenant, might try to gain access to the elevator lobby in order to wreak homicidal revenge on his envisioned target and any other collateral damage that he might be able to inflict. *Rivera v. Garcia*, 401 Ill. App. 3d 602, 613 (2010). That is for a jury to decide.

¶ 47   Since we have found that both defendants owed a duty of care to plaintiffs and there are material issues of fact as to negligence and causation, the trial court's order of summary judgment as to both defendants is hereby reversed and the cause is remanded for further proceedings and trial. Furthermore, since we have reversed the trial court's order for summary judgment, we have no need to address plaintiffs' other claims related to their attempt to file another amended complaint and amended expert witness disclosures.

¶ 48   Reversed and remanded.